Argued and submitted January 26, reversed and remanded as to the termination of father's parental rights; otherwise affirmed May 18, petition for review denied September 15, 2011 (350 Or 716)

In the Matter of V. L. A. M.-C.,
fka V. M.;
and A. R. H.,
Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L. M.,
aka A. M.,
*Appellant.*

Lane County Circuit Court
08403J, 05300J;
Petition Numbers
08403J02, 05300J04

In the Matter of V. L. A. M.-C.,
fka V. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. T. C.,
aka O. J. C.,
*Appellant.*

Lane County Circuit Court
08403J;
Petition Number
08403J03;
A145655

259 P3d 17

Michael Vergamini argued the cause and filed the brief for appellant A. L. M.

Margaret McWilliams argued the cause and filed the brief for appellant J. T. C.

Katherine Waldo, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

ORTEGA, P. J.

Riggs, S. J., concurring in part, dissenting in part.

## ORTEGA, P. J.

Father and mother appeal from judgments terminating their parental rights to their daughter, V. Mother also appeals from a judgment terminating her parental rights to her older daughter, A. We affirm without further discussion the termination of mother's parental rights to both children. However, because DHS failed to prove, by clear and convincing evidence, that it was improbable that V could be integrated into father's home within a reasonable time, we reverse the termination of his parental rights.

We state the facts as we find them on *de novo* review, ORS 19.415(3)(a), giving weight to the juvenile court's assessment of the witnesses' credibility, *State ex rel Dept. of Human Services v. R. T.*, 228 Or App 645, 655, 209 P3d 390 (2009).

V was born in July 2008. Because mother's history caused DHS concern about V's welfare, it quickly obtained a court order that placed V in father's physical custody, subject to DHS supervision, and provided that mother could have unlimited, but only supervised contact. When V was about one month old, she was placed in substitute care because of violations of that court order, after DHS learned that mother and V were staying in the home of the parents of mother's attorney, Vergamini.

Around the time that V was placed in substitute care, mother and Vergamini reported to police that father had threatened to kill mother and assault Vergamini. Father's then-attorney, who also was Vergamini's girlfriend, withdrew from representation after reporting that father had made what she considered credible threats of violence against mother and Vergamini. Father, who denied making the threats, was charged with four counts of harassment and, at the shelter hearing regarding V, the juvenile court ordered that mother and father should have no contact with each other. Less than one month later, father admitted that he and mother had violated the no-contact order.

Over the next several months, father consistently visited with V, and the visits went fine. At the request of

DHS, father also underwent a psychological evaluation with Dr. Truhn. Truhn recommended that father continue in parenting classes and participate in individual psychotherapy as a supportive intervention to process his relationship with mother, involvement with DHS, and parenting issues. Truhn thought, at that time, that there were no barriers to returning V if father continued to have a safe, stable home.

In an action agreement in December, father agreed to continue in parenting classes, to obtain safe and stable housing, to participate in therapy, and to have no contact with mother. During that same month, however, mother and father exchanged voluminous text messages. Despite obvious conflicts and anger between the two, father expressed a desire to raise a family with mother and assured her that he would not comply with DHS's rules "about U and Me and the Baby, how many times more U want Me to show U, Que I'm not gonna do what they say."

In December, when V was five months old, mother reported that father had threatened her on two recent occasions—once with a gun in a park, and a second time after pursuing her into a friend's home. However, father denied those accusations. Mother also reported to police that father had entered her apartment on two occasions without her permission, had rummaged through her things, and had left notes for her.

The following month, during one of father's visits with V, police interviewed father about allegations that he had recently sexually abused a 14-year-old girl, M, by touching her breast. Father first said that M was lying and was working with mother to discredit him. After giving inconsistent accounts of events, father finally admitted that he had intentionally touched M's breast and that he was aware that M was 14 years old. He was charged with sex abuse in the third degree. At the termination hearing, father testified that he had joked with M about touching her breast but had not actually done so and that he had confessed only to get the police to leave him alone so that he could visit with V.

Around this same time period, mother obtained a Family Abuse Prevention Act order, which father then violated.[1] Mother reported to police that father had left MySpace messages under the name "Rambito," saying that he wanted to start a new life with her. A few weeks later, mother reported that, on a different MySpace page, father had threatened to shoot her. When police spoke to father, he acknowledged sending the first message but denied involvement in the second, which nonetheless appeared to police to be from him. Likewise at the termination hearing, father denied sending the threat but admitted sending the "Rambito" messages. He attributed his violation of the restraining order to trying to end conflict with mother and stop her from making more accusations that would undermine his chances of having V returned. He believed that the succession of charges brought against him were instigated by mother to keep him from his daughter, "[b]ecause all of my accusers are her friends."

For much of 2009, father was in and out of jail and also in detention for an immigration issue, and DHS was unable to provide services. In February, father was arrested for violating the restraining order, charged with four counts of contempt of court, and spent about a month in jail. After that, he was held in an immigration facility for four months. Those events disrupted his visits with V and services that he had begun, which were a parenting class and counseling that was intended to, among other things, help him improve boundaries with mother. He nevertheless maintained contact with Lane, his DHS worker, and in June was granted legal residency and released from the immigration facility. Father called Lane shortly after his release but, pursuant to a juvenile court order, she could not schedule visits or provide services until father resolved an outstanding warrant and presented himself to the court.

---

[1] Although father denies any domestic violence and mother's accounts were inconsistent, it appears that mother and father's relationship was tumultuous and at least sometimes violent. Mother's older daughter A reported witnessing a fight between father and mother during which father hit mother. In addition, father admitted that he had sought—and achieved—a physical confrontation with one of mother's friends after the friend, contrary to father's requests, kept buying beer for mother during her pregnancy; he also acknowledged that mother hit him and pulled his hair on at least one occasion.

Although the record is unclear, it appears that father was arrested again, as he was released by the Lane County Circuit Court pretrial release office on July 13, subject to supervision. The following month, he had his first visit with V in several months, but the visit was cut short because he had to attend a hearing. Father then visited V consistently until the end of October, and he reengaged in parenting classes. At the end of October, however, father was arrested for violating his pretrial release agreement by failing to live at the residence specified in the agreement and by having contact with minors. Father admitted contact with V, which (unbeknownst to Lane) violated father's release order, and when he was arrested, a minor was in the car with him.

In November, while father was in jail, Truhn conducted a second psychological evaluation. This time, Truhn diagnosed an adjustment disorder with depressed and anxious mood and noted the possibility of histrionic and antisocial features. Truhn reviewed records indicating that mother and others had accused father of threatening behaviors and that M had accused him of sexual abuse, which would be indicators of antisocial personality features. In the evaluation, father denied those accusations, and Truhn was not in a position to determine which, if any, accusations were true. In light of the conflicting accounts, identifying services for father was difficult. Truhn thought that, before V could be returned to father, he would need a safe, secure place to live and

> "would need to either be exonerated from the above-named charges or have completed the anger management program, psychosexual evaluation, and individual and group therapy and demonstrate a period of stability and compliance with the legal expectations of living in a community. He would need to demonstrate an ability to maintain safe and secure boundaries in relationships and would not be acting out in any type of an aggressive or threatening fashion."

If the accusations were false, then father would need parenting classes and individual counseling for depression and anxiety. In either case, none of father's problems necessarily

would preclude parenting if he responded positively to therapy. Truhn did not identify a probable time that would be required for treatment:

> "Q. So if the court finds that [father] did indeed molest [M], he would at least need a psychological evaluation?
>
> "A. Yes.
>
> "Q. That might lead to a recommendation for sexual offender treatment?
>
> "A. Yes.
>
> "Q. That could take a considerable period of time?
>
> "A. Yes."

Truhn agreed that services for father "could take months or years."

Father told Truhn that he had not seen mother since September,[2] that their sexual relationship had ended over a year before the evaluation, that he did not want to be in a relationship or to have contact with mother, and that mother was not safe to be around V. In Truhn's view, however, those statements were inconsistent with father's presentation. Father still appeared to have an emotional need to maintain his relationship with mother, and he had difficulty being clear about how he would set limits if she contacted him.

Father's testimony bore out Truhn's observations. At the termination hearing, father testified that he is very much in love with mother and that mother took good care of V. However, when asked if he would discontinue contact with mother if he had custody of V, father answered, "I think I have learned my lesson. I know that if I do something wrong, I can lose my daughter. And I will follow whatever rules you put in place." Father acknowledged earlier violations of the no-contact order, and he claimed that he understood now that he could lose V if he did not follow the rules.

---

[2] Truhn's evaluation says only that "[father] said that he has not seen [mother] since September." The parties point to nothing supplying more information about where or for how long father saw mother, whether he saw her more than once, or whether they had any communication in September. We have found no further information in the record about the context of that contact.

The record concerning V's needs is scant and very general. According to Truhn, if father were incarcerated and thus only inconsistently available for a child, the child could face problems with attachment: "[A]n unstable environment can in itself produce oppositional defiant behavior, anxiety for the child, those types of issues." Truhn also identified a risk of turmoil for a child in father's and mother's joint care. The only evidence in the record about V's specific needs came from her foster parent and Lane. The foster parent testified that V is doing well, was screened for early intervention services and was found not to need them, and seems capable of forming an attachment to an adoptive family. Similarly, Lane testified that V is adoptable and has an identified adoptive resource.

At the time of the termination hearing in December 2009, father was serving a 90-day jail term for violating probation in a contempt of court case, and he was scheduled to be released the following month. Father was awaiting trial on the charge of third-degree sex abuse involving M, but that charge was dismissed in the middle of the termination hearing.

■ In a detailed opinion, the juvenile court concluded that father's parental rights should be terminated under ORS 419B.504.[3] The court found as follows. Father engaged in domestic violence against mother, which was witnessed by mother's daughter A, and he threatened mother and Vergamini. Although father has some concerns about mother, he is obsessed with her and continues to believe that she is an appropriate person to care for children. Father sexually abused M, and he would need a psychosexual evaluation and sex offender treatment before he could be a safe parent for V.

---

[3] The court also found that father's rights should be terminated because of neglect under ORS 419B.506. Father points out that the record contains no evidence that, during the six months before filing of the termination petition, he was ordered to pay any costs of V's substitute care or had any income with which to do so, neglected to visit when he was able to do so, or failed to communicate with DHS. Although DHS asserts that the juvenile court did not err by finding that father's parental rights should be terminated for neglect, DHS identifies no supporting evidence. Having reviewed the record, we conclude that it does not support that basis for termination.

DHS does not seek to terminate father's parental rights based on extreme conduct under ORS 419B.502(1), which may include sexual abuse of any child.

His need for assessment and treatment, however, were stymied by his denial of any problems. Ultimately, father's behavior shows that "he is not a safe parent and that services rendered to him to date have been ineffective. * * * Father is not now, nor will he be within any timeframe which is reasonable for [V], a minimally adequate parent."

Father appeals. He contends that DHS failed to prove that he is unfit by reason of conduct or conditions seriously detrimental to V. In father's view, integration of V into his home was feasible because father expected to be released from jail shortly after the termination hearing, had made plans for a safe home for V, and was willing to participate in services. DHS failed to offer any evidence of the time period for integration that would be reasonable in light of V's needs.

DHS responds that, under the totality of the circumstances, father is unfit because of his obsession with mother, which he has pursued despite restraining orders and which would expose V to danger, and his sexual abuse of M, which caused him to be unavailable to parent V. DHS argues that integration is not possible within a reasonable time because father's unwillingness to admit to past conduct impedes the possibility of treatment.

■ Because we agree with father that DHS failed to prove, by clear and convincing evidence, that it was improbable that V could be integrated into his home within a reasonable time, we reverse.

Father's parental rights were terminated pursuant to ORS 419B.504, which provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"* * * * *

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

The factual basis for termination, unless admitted, must be proved by clear and convincing evidence. ORS 419B.521(1).

Under ORS 419B.504, we must decide, first, whether the parent is unfit—that is, whether the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child—and, second, whether, given the parent's conduct or condition, it is improbable that the child may be integrated into the parent's home within a reasonable time. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). A "reasonable time" is a period "that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). That definition requires a child-specific inquiry and "testimony in psychological and developmental terms regarding the particular child's requirements." *Stillman*, 333 Or at 146.

Here, we assume, without deciding, that father is unfit, and we proceed to the question whether integration into father's home is improbable within a reasonable time. The dissent contends that, under *Stillman*, we must determine whether father is unfit before we engage in an analysis of whether integration is improbable within a reasonable time. 242 Or App at 640-42 (Riggs, S. J., dissenting). In

*Stillman*, the court explained the test for termination as follows:

> "ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and *only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'* That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

333 Or at 145-46 (emphasis added). The dissent focuses on the phrase "only if," but disregards the context of that phrase. The Supreme Court stated the rule in terms of what must be shown "before the court orders termination," *id.* at 145, and, within that framework, emphasized that the court should not reach the integration inquiry unless the unfitness element is proved. The Supreme Court went on to caution against conflating the unfitness and the integration analyses by treating the anticipated duration of a parent's conduct or condition as part of the unfitness analysis. *Id.* at 149 (explaining that the father's incarceration and consequent unavailability to the children was a condition that could warrant a finding of unfitness, but that the duration of the incarceration was pertinent to the integration, but not the fitness, inquiry).[4]

Certainly, in an analysis of the basis for termination, a court must consider the "particular parental conduct or conditions," *id.* at 145, to resolve the integration question. We

---

[4] In *Stillman*, the court concluded that the father's incarceration was not seriously detrimental to the children, who had a close bond with the father and were doing well, and it reversed the termination of the father's parental rights on that basis, without reaching the integration question. 333 Or at 152-53.

see no logical reason, however, that a court should be required to reach a legal conclusion about whether such conduct or conditions amount to unfitness, as defined by the statute, where termination is unwarranted because the integration element was not proved. In such cases, it is a more efficient use of the court's resources to assume, without deciding, that unfitness was proved and proceed to the integration question. *See, e.g., Dept. of Human Services v. T. C. A.*, 240 Or App 769, 780, 248 P3d 24 (2011) ("[W]e need not decide whether mother is unfit, because we conclude that, in any event, DHS failed to prove that the children's integration into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change."); *State ex rel Dept. of Human Services v. Keeton*, 205 Or App 570, 583, 135 P3d 378 (2006) ("In all events, even assuming, without deciding, that mother's present, untreated, condition is seriously detrimental to the children, termination pursuant to ORS 419B.504 is unwarranted because the state has failed to prove that integration of the children into the parent's home 'is improbable within a reasonable time due to conduct or conditions not likely to change.' ").

Thus, we need not decide whether father was unfit, because we conclude that, in any event, DHS has failed to prove, by clear and convincing evidence, that V's integration into father's home was improbable within a reasonable time. The obstacles to father being a safe parent were (1) his relationship with mother and (2) his sexual abuse of 14-year-old M. As we read the record, however, the relationship between father and mother was over, and father was willing to participate in counseling to resolve his feelings for mother. Because of the incident of sexual abuse, father needed a psychosexual evaluation and might need sex offender treatment, but his potential need for treatment would not preclude his becoming a safe parent.

We share the juvenile court's concerns about father's relationship with mother. The relationship was turbulent and sometimes violent, and V could be endangered by such violence or, if father had custody and allowed mother a caregiving role, by mother's parenting deficits. Father was, at times, dishonest about his involvement with mother, and, in

late 2008 and early 2009, he disregarded court orders prohibiting contact with her. Truhn thought that father "was at least in the past obsessed with [mother]" and that he continued to have difficulty determining how to set boundaries with mother.

Nevertheless, we do not believe that father actually remained involved with mother or that he was likely to again become involved with her, even if he wanted to do so. Nothing in the record suggests that father continued, after early 2009, to pursue contact with mother as he did in 2008. Although he was in jail and in an immigration facility for part of 2009, the record does not show that he was in contact with mother during periods when he had the opportunity to be.[5] As the dissent notes, father is not a credible witness about his relationship with mother, 242 Or App at 642-43 (Riggs, S. J., dissenting), and we disregard his testimony that he now would abide by a no-contact order. Nevertheless, the record does not indicate that there was an ongoing relationship between father and mother after early 2009, which was well before the December 2009 termination hearing. In short, although father may still feel an attachment to mother, he was not acting on those feelings by the time of the hearing. Moreover, father had demonstrated a willingness to engage in counseling to address his feelings for mother. Before his arrest and immigration detention, father had an initial assessment and two sessions of individual therapy. His therapist found him to be open to counseling. In that brief period of counseling, father made minimal progress in skills with boundaries and communication, but nothing in his counseling records suggests that father was unwilling to engage in services or unable to benefit from them or that such counseling would take a long time.

We are, of course, also troubled by father's abuse of M. This record, however, gives us no real basis for assessing whether that incident makes it improbable that father would become a safe parent within a reasonable time. According to

---

[5] As noted above, father saw mother in September 2009, but the record contains no information about the nature or extent of that contact. Around the time of the termination hearing, mother gave $20 to a friend to give to father. The record does not show other contacts between mother and father in that time period.

Truhn, father needed a psychosexual evaluation that *could* result in a recommendation for treatment and that such treatment *could* take a long time. Truhn found it difficult to identify services for father without first knowing whether father had committed various acts that he was accused of, and denied, committing. Truhn did not suggest that father would be unable to benefit from services or unwilling to engage in them or that father's denial of the accusations would preclude father from benefiting from services. Nor does it appear from father's history that he will fail to meaningfully engage in needed services.

The dissent's assertion that we do not question the juvenile court's findings that father "would need a psychosexual evaluation and sex offender treatment, that his denial of wrongdoing had stymied treatment, and that services rendered to date have been ineffective," 242 Or App at 644 (Riggs, S. J., dissenting), is not entirely correct. We acknowledge that father needed an evaluation and treatment, but the record does not support the juvenile court's view that any such treatment had been stymied by father's denial of wrongdoing. Truhn's recommendation for a psychosexual evaluation and sex offender treatment arose from a psychological evaluation conducted on November 11, 2009, just under a month before the termination hearing began.[6] Nothing in this record suggests that father's denials in any way stymied any treatment or that any treatment was ever offered, let alone provided and shown to be ineffective.

Under ORS 419B.504, DHS has the burden to prove that it is improbable that the child can be integrated into the parent's home within a reasonable time, as measured by the child's needs. This is not a case in which DHS made such a showing by offering evidence that the child has such pressing needs that little or no delay is reasonable; indeed, DHS offered no evidence about V's need to achieve permanency. This is not a case in which DHS showed that integration is improbable because the parent's problems are an intractable

---

[6] DHS apparently had known of the accusation of sexual abuse for at least 10 months before that evaluation: The police officer to whom father admitted the abuse interviewed father in January 2009, during father's visit with child at a DHS office.

barrier to reunification. To the contrary, the record shows that father needed a psychosexual evaluation and, depending on the evaluator's recommendation, possible treatment. There is an absence of evidence that father could not or would not be successfully treated or that he could not or would not successfully complete treatment within a reasonable time.

The dissent states that, in light of Truhn's testimony and father's denial of abuse of M, the dissent is "unable to conclude that, even with 'successful' treatment, father probably will become a safe parent within *any* time. To require, in addition, that the state provide explicit evidence that a particular treatment cannot be successfully completed within a reasonable time asks too much * * *." 242 Or App at 644 (Riggs, S. J., dissenting). Truhn's testimony, however, contradicts the dissent's view. Truhn testified that, if the abuse occurred, father nevertheless might become a safe parent, and his ability to parent would depend on his response to treatment, which "could take months or years." Certainly, DHS need not prove the time required for treatment with mathematical exactitude. On this record, however, we see no principled way to conclude that integration is improbable in a possible timeframe of "months or years" and no way to determine whether that possible timeframe is two months or two years. Given the lack of evidence regarding V's needs, we do not know if waiting "months" would be unreasonable for her. In short, the record falls short of clear and convincing evidence that integration is improbable within a reasonable time due to conduct or conditions not likely to change.

Reversed and remanded as to the termination of father's parental rights; otherwise affirmed.

**RIGGS, S. J.,** concurring in part, dissenting in part.

I concur in that portion of the majority opinion that affirms the termination of mother's parental rights to both daughter A and daughter V. I dissent from that portion of the majority opinion that reverses the termination of father's parental rights to daughter V.

To begin with, I agree with and commend the accuracy of the majority's recitation of the relevant statutory and case law and the evidence in this case. In fact, the majority's

factual discussion forms much of the basis for my dissent. I also agree that our review is *de novo* and that the correct relevant standard is proof by clear and convincing evidence, giving appropriate weight to the juvenile court's assessment of witness credibility. I part company with the majority as to whether, under the facts outlined in the majority opinion and the analysis contained in the trial court's findings of fact and conclusions of law, the state has sustained its evidentiary burden of proof. I believe that the totality of the facts support, clearly and convincingly, the trial court's conclusion that father is not fit and is not a candidate for providing reintegration of V within any reasonable period of time.

Unlike the majority, I believe that it is necessary for us first to determine that father is unfit before engaging in the inquiry as to whether integration of the child in father's home is improbable within a reasonable time due to conduct or conditions not likely to change. *See State ex rel SOSCF v. Stillman,* 333 Or 135, 145, 36 P3d 490 (2001) (court engages in the integration inquiry "only if" court determines that the parent is unfit). I would conclude on this record, based on the circumstances described in the majority opinion and highlighted in this dissent, that father is unfit.

As for the question of integration of the child into father's home, I would affirm the trial court's determination that it is improbable that integration could occur within a reasonable time due to conduct or conditions not likely to change, primarily based on facts that I highlight here. V, the child in question here, currently is approximately two and a half years old. She was a toddler at the time of the trial and has been in one kind or another of substitute care of the state since she was about a month old. At the time of the trial, the evidence shows that V has made progress in becoming a happy and normal child, notwithstanding the tumultuous circumstances that accurately characterize the nature of her brief life with father and mother and the horrific circumstances experienced by mother's other children, as demonstrated by the facts in mother's case here and in the several termination proceedings involving V's siblings that occupy much space in the trial and appellate records of this state. V

has been assessed as capable of forming a successful attachment to an adoptive family. An appropriate adoptive resource has been identified.

The majority opinion does a credible job of outlining father's past circumstances, but I wish to highlight a bit of that background that father brings to the table for this little girl. The record includes evidence of repeated instances in which father seeks to continue the highly toxic relationship with mother, along with the proclaimed desired involvement of mother in V's life if father prevails in the termination proceeding. Father was warned repeatedly over a substantial period of time that involvement of mother in V's life was not possible and that father needed to build a life without mother's influences on the future family. Nevertheless, father has continued to seek involvement with mother in defiance of Department of Human Services (DHS) rules and notwithstanding repeated warnings that that conduct put at risk father's future relationship with V. Father's disdain for the rules is amply characterized by text messages that father and mother exchanged, including one message in which father stated, "[H]ow many times more [do] U want me to show U, Que I'm not gonna do what they say."

The majority also describes evidence of a sexual encounter between father and a 14-year-old female acquaintance, M. After the incident was reported, father first accused the girl of lying, then admitted the sexual encounter, and then, again, changed his story and denied that the sexual encounter occurred and said that it was just a "joke." Although the charges against father were dismissed, the trial court in the termination hearing made specific findings that father committed the sexual abuse with the 14-year-old girl based on the evidence in the termination case.

The majority also adequately describes other encounters between father and mother connected to violence, criminal conduct, and injury as reported to police by mother, including repeated incarcerations of father for a variety of reasons over relevant periods, including at the time of the termination hearing.

One of the state's expert witnesses, Dr. Truhn, a psychologist, examined father and concluded that father had a

compulsive emotional need to continue his involvement with mother. Indeed, father himself testified at the termination hearing that he was still very much in love with mother, and that he believed that mother "took very good care of V." The majority acknowledges that mother presents risks to V, that father has in the past been dishonest about his involvement with mother, and that he has even disregarded court orders prohibiting contact with mother, having had contact with her as recently as September 2009, just a few months before the termination hearing.[1] Inexplicably, however, the majority disregards the juvenile court's implicit finding that father is not credible about his relationship with mother and finds instead that father is not likely to again become involved with her. That is not a risk that I am prepared to take for V. Father's past conduct, including his candid text message to mother, discussed above, casts serious doubt on his claims that he would comply with any prohibition of contact with mother, even with counseling.

As to father's sexual abuse of M, the majority acknowledges that it is troubling, but concludes, essentially, that there is no evidence that father is not amenable to treatment that would make him a safe parent within a reasonable time. Again, I have a different view of the evidence. Although seemingly acknowledging father's sex abuse, 242 Or App at 636, the majority nevertheless suggests that there is ambiguity in that fact, noting that father denied the abuse. In fact, the record shows that father denied, then admitted, then denied the abuse. The trial court found that father had in fact committed the sexual abuse of M and would need a psychosexual evaluation and sex offender treatment, that his denial of wrongdoing had stymied treatment, and that services rendered to date have been ineffective. The majority does not question those findings. Truhn opined that treatment for this kind of sexual molestation "could take months or years" and that a full assessment would be needed to structure the correct program.

---

[1] I note that the majority says that, after early 2009, "the record does not show that [father] was in contact with mother during periods when he had the opportunity to be." 242 Or App at 638. However, the record shows that father told Truhn that he had had contact with mother as recently as September 2009.

The majority faults the state for failing to present evidence that father could not be successfully treated within a reasonable time. My view of the facts supports a conclusion that the state has sustained its burden of showing, by clear and convincing evidence, that father is not a candidate for integration of V into his life within *any* reasonable time in the foreseeable future. All of the evidence—Truhn's testimony and father's own duplicitous behavior in defiance of DHS rules, in particular—points inexorably to that conclusion. On this record, it appears that father is unlikely to change his conduct. In view of father's persistence and untruthfulness with regard to his relationship with mother and his deceit and unwillingness to admit at the termination hearing that he had sexually abused M, even after having earlier admitted it, I am unable to conclude that, even with "successful" treatment, father probably will become a safe parent within *any* time. To require, in addition, that the state provide explicit evidence that a particular treatment cannot be successfully completed within a reasonable time asks too much, and I do not believe that the statutes, the case law, or the field of psychology require any more specificity. The adverse effect on the child of prolonging the harmful relationship with father and delaying permanency is self-evident.

Thus, I would conclude that the record overwhelmingly supports the trial court's opinion. It is time this case is affirmed and this little girl is given the opportunity for as much of a normal life as can be provided for her. And as soon as possible.

I respectfully dissent.