No. 175          March 11, 2026          555

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. M. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. J.,
*Appellant.*

Marion County Circuit Court
24JU03926; A187442 (Control)

In the Matter of M. M. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

E. S.,
*Appellant.*

Marion County Circuit Court
24JU03925; A187985

Courtland Geyer, Judge.

Submitted December 17, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant J. J.

G. Aron Perez-Selsky and J. Peter Druckenmiller filed the brief for appellant E. S.

Dan Rayfield, Attorney General, Benjamin Gutman, Interim Deputy Attorney General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Father and mother appeal judgments terminating their parental rights to their child, M, who was five years old at the time of the termination of parental rights trial. Father makes several challenges to the juvenile court's rulings that he was unfit under ORS 419B.504 and that terminating his parental rights was in M's best interests. Similarly, mother asserts that the court erred in terminating her parental rights as to M. On *de novo* review, we conclude that the Oregon Department of Human Services (ODHS) established unfitness as to both parents and neglect as to mother by clear and convincing evidence and, further, that termination is in M's best interests. Therefore, we affirm.

"We review the record in proceedings for termination of parental rights *de novo*, ORS 19.415(3)(a), and determine anew whether to terminate parental rights." *Dept. of Human Services v. J. M.-A.*, 333 Or App 334, 336, 554 P3d 263 (2024).

A juvenile court may terminate a parent's parental rights based on unfitness, ORS 419B.504, if it determines "by clear and convincing evidence that the parent is unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." *Dept. of Human Services v. C. M. K.*, 270 Or App 1, 16, 346 P3d 1254, *rev den*, 357 Or 324, *cert den*, 577 US 944, 136 S Ct 371, 193 L Ed 2d 300 (2015) (internal quotation marks omitted); ORS 419B.521(1) ("The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *.").

To determine whether a parent is unfit, the court must first determine whether "the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child." *Dept. of Human Services v. R. K.*, 271 Or App 83, 88, 351 P3d 68, *rev den*, 357 Or 640 (2015). At the second step, the court must determine whether "integration of the child into the parent's care is improbable within a reasonable time due to conduct or conditions not likely to

change." *Id.* Both the "serious detriment" and "reasonable time" inquiries are specific to each child and require evidence "in psychological and developmental terms" regarding the particular child's needs. *Dept. of Human Services v. T. M. M.*, 248 Or App 352, 366-67, 273 P3d 322, *rev den*, 352 Or 170 (2012); *Dept. of Human Services v. A. L. M. / J. T. C.*, 242 Or App 625, 635, 259 P3d 17, *rev den*, 350 Or 716 (2011) (internal quotation marks omitted). Moreover, "a parent's fitness must be measured *at the time of the parental rights termination trial.*" *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006) (emphasis in original).

In addition to unfitness, the juvenile court may terminate a parent's rights on the ground of neglect. The statute allows for termination "if the court finds that the parent * * * ha[s] failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition." ORS 419B.506. As relevant here, a parent neglects a child when the parent, without justifiable excuse, fails, for the six months prior to the filing of the petition, to maintain visitation or contact with the child, to communicate with the child, or to communicate with the child's custodian. ORS 419B.506(1) - (3); *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 788-89, 126 P3d 758 (2006). ODHS filed its petition to terminate mother's rights on August 2, 2024, so the relevant period is February 2024 to the end of July 2024.

Even if the court determines that one or more statutory grounds for termination are proved, the court may only terminate the parent's parental rights upon concluding that clear and convincing evidence also establishes that termination is in the particular child's best interests. ORS 419B.500; *Dept. of Human Services v. D. E. P.*, 315 Or App 566, 570, 502 P3d 764 (2021). That determination involves considerations of such factors as "(1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 53, 515 P3d 927 (2022).

We recount the evidence pertinent to those inquiries. The juvenile court took jurisdiction over M in January 2023 when he was two years old over concerns that father's untreated mental health issues and mother's substance use, as well as both parents' residential instability, interfere with their ability to safely parent M. M has been with the same resource parent since he was removed from father's custody in August 2022, except for a few months in 2023.

Before the juvenile court pursued jurisdiction over M, mother had already moved to Colorado and had no contact with M for about a year. During the life of the dependency case, mother visited Oregon twice for a couple months at a time to try to establish a bond with M. During the first visit, she failed to make any visits with M, but she was able to visit with M twice during her visit in 2024. While mother's visits with M were calm and uneventful, M did not show signs that he understood that she was his mother; according to the resource parent, he describes her as daddy's mom. Mother testified that while she wanted custody of M, it would be in his best interest to stay in his current placement because "it's just been too long." In addition, while mother claimed she had been sober for five months at the time of the termination trial, she had not completed any services recommended by ODHS to ameliorate the conditions or circumstances that led to jurisdiction.

Father, on the other hand, actively engaged with ODHS, participating in visits with M and some recommended services. Despite his own distrust of the process, which he attributed in part to his own childhood experiences,[1] father showed substantial dedication to M. It is apparent on this record that father loves M, and that M continues to have an emotional attachment to father.

Father was diagnosed with bipolar disorder at a young age and received medication for it; he described taking medications for his mental health as being "drugged." His adoptive mother testified that father's bipolar disorder was "very manageable" while he was consistently taking medication. However, he stopped taking medication at age

---

[1] Father was adopted at age six from foster care and has described the experience and his childhood as abusive.

18 and has stated repeatedly that he disputes the diagnosis of bipolar disorder. According to his adoptive mother, father became more aggressive after he stopped taking his medication, had more angry outbursts, and had trouble maintaining employment. His adoptive parents asked him to leave their house after an incident in which he shoved his adoptive mother, and his relationship with them is, in his adoptive mother's words, "not a good relationship."

Dr. Guastadisegni psychologically evaluated father in the course of these proceedings and diagnosed him with bipolar I with mixed features and mood congruent psychotic features; unspecified anxiety disorder; attention deficit hyperactivity disorder; and excoriation disorder, which is a skin picking disorder. Father also has features of post-traumatic stress disorder (PTSD). Guastadisegni also opined that a diagnosis of schizoaffective disorder, schizophrenia, and delusional disorder needed to be ruled out. During his evaluation, father presented in a "hyperverbal manner," as he also did during his trial testimony and in various other contexts. He spoke insistently about violations of his rights and expressed convoluted theories about who was responsible. Guastadisegni found that when father discussed those topics, he presented as "irrational, illogical, if not delusional." Such communication by father occurred during his interaction with caseworkers, treatment providers, and during his trial testimony.

Father believes that he was misdiagnosed and improperly treated with medication and therapy as a child. Guastadisegni concluded that father suffers from chronic mental health issues that stem from childhood and that since discontinuing medication, father has "never functioned independently with any consistency." He observed that father has "flight of ideas and racing thoughts," and has delusional beliefs surrounding his birth certificate, the government, sovereignty, and citizenship. Guastadisegni recommended that father be referred to a psychiatrist to be prescribed medication and that his treatment should include education to help father understand the cycles of bipolar disorder. He also recommended education for father's "delusional and irrational thinking regarding the government

and his sovereign rights" because "they lead to aggressive interactions and unusual behaviors." Father also needs to work with a parent trainer to understand M's developmental needs.

Father made several threatening phone calls to Guastadisegni following the evaluation and maintained at trial that the diagnosis of bipolar I is "wrongful." He acknowledges that he suffers from PTSD due to all the trauma inflicted on him by violations of his rights and acknowledges that he sometimes reacts in anger, including in front of M, but believes his reactions are justified and denies that M is harmed by witnessing angry interactions between him and ODHS staff.

Father acknowledged at trial that, to regain custody of M, he needs to "see a psychiatrist and deal with medication management." However, he claims that despite his efforts, he has not been able to find someone who will provide such treatment to him.

Father has been working with the same ODHS caseworker, Davis, throughout the life of the case, and Davis has made steadfast efforts to assist father. Although father was ordered to follow up with the treatment recommended by his psychological evaluation, he refused Davis's numerous offers of help to connect him with a psychiatrist and assist him with transportation, communicating in an email, "I told you I don't need your help to schedule or do anything for my mental or physical health." Case planning with father was also difficult because conversations with him were generally one-sided and unproductive. Father calls and sends text messages to Davis 20 to 30 times a day, expressing grievances about violations of his rights and threatening to sue Davis. Davis has made an effort to stay engaged whenever possible, though often he can do little more than listen to father for 45 or 60 minutes or, in at least one case, for three hours.

Father's testimony about his efforts to work with treatment providers was inconsistent with Davis's own understanding of what was available to him and occurred despite father's refusals of help from Davis. Father did

participate in remote talk therapy sessions with Melissa Nelson, a behavioral health therapist, for four months without reporting those efforts to Davis and testified that he found those sessions "very helpful," though Nelson reported similar dysregulated interactions with father.[2] Nelson diagnosed father with complex PTSD (CPTSD) and believes that father needs to see a psychologist or psychiatrist in an office setting so that a person can take his vitals and manage medication for him. In the four months that she treated him, Nelson did not make much progress in helping father regulate his emotional response. She explained that, with a diagnosis of CPTSD, it can take a year or more for a person's dysregulation to be controlled, and until then, the person will show symptoms of schizophrenia and bipolar disorder.

Although Nelson's group provides medication management and Nelson would have helped father connect to that service, father abruptly ended their relationship in a text that led Nelson to believe that father had been ordered to work with a psychiatrist. Nelson believed that, without medication management and therapy, father's symptoms of dysregulation will not go away on their own and that he will have to actively work to resolve them.

The record contains evidence of many volatile interactions between father and members of the public, court staff, and ODHS staff. Some of those interactions occurred in M's presence and occasionally impacted visits between father and M, including a period when visits were paused and then moved to virtual visits.

M was evaluated by Dr. Giesick, who described him as anxious and ultimately diagnosed him with other specified anxiety disorder and noted a need to rule out attention deficit hyperactivity disorder (ADHD), autism spectrum disorder, and intellectual disability. M was nonverbal when he came into care at age 2 and Gieseck believed he has special needs that heighten the need for a stable and consistent parent. She acknowledged that a cessation of contact

---

[2] In addition to father's dysregulations in Nelson's sessions that made it "very difficult to get his attention or to break his focus," Nelson also testified that father texted her as many as 70 times in a day. She admitted that had they ever met in person, his "level of dysregulation would have made me feel uncomfortable."

with father would be difficult for M in the short term, but considers their connection to be tenuous, in part due to M's anxiety about father's unpredictable behavior.

Testimony from M's resource mother also suggested a need for a stable caregiver. M requires intervention for emotional dysregulation and needs lots of cues and repetition to complete daily tasks. He has shown aggression towards other children and requires cues to use his coping skills. There have been incidents that required M's resource mother to go to the school to help him de-escalate. M has an individual education program (IEP) at school, and due to his cognitive delays, will be tested for autism spectrum disorder.

If father's rights are terminated, M's resource mother, who is prepared to adopt him, would be willing to allow contact between M and father, if it was safe and appropriate and done through mediation. She has concerns about it but would be open to contact if it could be done in a safe and healthy manner for M. She expressed commitment to provide M with counseling to assist him with any such transition.

We proceed to our analysis of the bases for termination of the rights of the parents, beginning with mother. The juvenile court terminated mother's parental rights, determining that she was unfit based on multiple grounds, including her failure to treat her substance abuse, and failure to maintain a stable living situation suitable for M. The trial court also determined that mother had neglected M. Considering that the evidence demonstrated that mother moved to Colorado and effectively abandoned M with father, whom she knew struggled with a serious mental health condition, after which she had little contact with ODHS and engaged in only two in-person visits with M over the entirety of the case, ODHS presented clear and convincing evidence that mother is unfit based on neglect. Because the evidence showed that mother failed to engage in any alcohol abuse treatment and did not have a stable residence at the time of termination, ODHS also presented clear and convincing evidence that mother is unfit based on her failure to address her substance abuse and maintain a stable living situation.

Considering the length of time that M has been in substitute care and his special emotional and developmental needs, and mother's failure to even begin to take the steps necessary for M to be integrated into her care, the evidence demonstrated that M could not be integrated into mother's care within a reasonable period of time.

As to the trial court's determination that mother neglected M, the evidence established that between February and August of 2024, mother had two in-person visits with M in February before she returned to Colorado. After that, she maintained sporadic contact with ODHS despite having Davis's phone number and knowing how to reach him for the entire pendency of the case. She did not begin virtual visits with M until November 2024, well after the petition was filed. She also did not communicate with the new permanency worker assigned to the case until November 2024. That evidence clearly and convincingly established that mother failed to maintain visitation and contact with M and failed to communicate with M's custodian for the six months prior to the filing of the termination petition. Thus, the evidence established that mother neglected M.

Finally, ODHS presented clear and convincing evidence that it was in M's best interest to terminate mother's parental rights. Mother and M have no bond; he does not even understand that she is his mother. Mother herself admitted that it would be traumatic for M to return to her care at this point because it has been too long and that it is in his best interests to remain in his current placement, which is being considered as an adoptive resource. Considering those facts, and M's heightened need for stability and consistency, the benefits of terminating mother's parental rights far outweigh the potential harm.

We proceed to address the case for termination of father's parental rights. We again acknowledge at the outset that father loves M, has remained engaged in the case and participated in visits, and is motivated to regain custody of M. However, father's untreated mental illness continues to be a serious barrier to his ability to be a safe parent to M and to access the services that would help him do that. Though he understands that he must engage in services to resume care

of his son, he is not in a state to receive such services and, indeed, continues to dispute that the services are needed at all. Most if not all of his interactions with service providers and others are characterized by an inability to listen and engage productively, even while his trial testimony suggests he is making a genuine effort to do so at times.

Father challenges the determination of unfitness on several grounds, asserting that there is insufficient evidence of lack of effort to adjust his circumstances despite reasonable agency efforts, that his mental illness renders him unfit, and that he has failed to present a viable plan for M's return to father's care. We have reviewed the record with great care and conclude that it provides clear and convincing evidence to refute all of the bases for reversal asserted by father. The record leaves no room for doubt that father's mental illness is seriously detrimental to M and that father has not made sufficient efforts to mitigate those concerns despite extensive ODHS efforts on father's behalf.

Father demonstrates no insight about the impact on M of his volatile interactions with others and shows no concern about how efforts to accommodate father may present difficulties for M. As an example, father was unmoved by the significant additional distances M was required to travel to accommodate father's preferences regarding visits and attributed any problems M was experiencing to actions of others that he considered wrongful or unjust. The record demonstrates that father's mental illness has contributed to instability in his personal circumstances that would impact his ability to provide a stable environment for M. Significantly, father dismissed any concerns about his ability to work with teachers and treatment providers who may be working to address problems related to M's behavior and his special needs, but father's history of volatile interactions with service providers does not provide any basis for believing such interactions will be productive. Given M's significant support needs, father's inability to act cooperatively with various providers, and his tendency to act in an unpredictable and volatile manner without regard for its impact on M, father's untreated mental illness poses a serious detriment to M.

The record provides no reason to believe that father is capable of addressing these unfitness concerns within a time period that is reasonable for M. Though father has remained engaged during M's extended period in substitute care, and despite efforts that father no doubt experiences as quite extensive, he has not demonstrated any progress in addressing his mental illness and the volatility and instability that it produces in his interactions with others. Father's unfitness is established by clear and convincing evidence on this record.

The record also establishes that termination of father's parental rights is in M's best interest, though addressing that question is difficult. We are not inclined to minimize the importance of the bond between M and father and have wrestled with our concern regarding the loss that M will experience if contact is severed. However, the record does not persuade us that a guardianship is a viable option in this case. Although father argues that ODHS failed to establish that a guardianship is not possible, father's testimony consistently focused on his desire to parent M himself, and he did not display any willingness or ability to adjust to circumstances where another caregiver was exercising primary responsibility for M's care. Father's inability to work with service providers and his insistence that all of his difficulties are attributable to other people's failures make it impossible to imagine him cooperating with such an arrangement. On this record, clear and convincing evidence establishes that, of the options practically available, termination of father's rights is in M's best interest.

Affirmed.