Argued and submitted August 20, reversed November 5, 2008, petition for review denied January 29, 2009 (345 Or 690)

In the Matter of N. R. E. T.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Appellant,*

*v.*

A. T.,
*Respondent.*

Lane County Circuit Court
05490J; Petition Number 05490J03;
A137955

196 P3d 73

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

James A. Palmer argued the cause and filed the brief for respondent.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

The Department of Human Services (DHS) appeals a judgment that denied its petition to terminate father's parental rights to his child, N. DHS contends that termination is in the best interest of N because of the combination of father's drug addiction and history of domestic violence, as well as N's needs for permanency and stability. On *de novo* review, we agree with DHS and reverse the judgment.

Father, by his own admission, has an extensive history of drug abuse. He became addicted to marijuana at the age of 11 or 12, and soon began abusing other drugs. At age 18, father was seriously injured in an accident and became addicted to the pain reliever OxyContin. He began buying opiate-derived drugs on the street and obtained anything that he could to satisfy his addiction.

During that period of addiction, father's first child, T, was born. Father lived with T's mother in Alaska until T was approximately one year old. When T was seven months old, father "came home high" on methadone and Klonopin and, in father's words, "grabbed [T] and laid him on the floor, and passed out. And [T's mother] got up—I don't know what happened or what, but I threw her onto the couch * * *." As a result of that incident, father was convicted of committing assault in the presence of a child.[1] Shortly after the incident, T's mother left father because of his drug addiction.

Father continued to visit T and T's mother. Then father began a relationship with L. At the time, L had one child, G, who was approximately eight months old. After that relationship began, T's mother denied father visitation with T. Father has not seen T since 2001 or 2002.

N, the focus of this termination proceeding, was born in May 2003. Father and L are N's parents. In May 2003, father was addicted to methamphetamine, which he smoked on a daily basis. Father was also addicted to cocaine, and was injecting both drugs. L also was abusing drugs. After N was

---

[1] Father was sentenced to five years' probation and ordered to complete treatment recommended by the Anchorage Alcohol Safety Action Program. Father did not complete that program, and a bench warrant issued for his arrest. At the time of the termination hearing, that warrant was apparently outstanding.

born, both parents stopped using drugs for a while. Father, however, injured his hand and once again became addicted to pain medication. According to father, his addiction "got so bad, that all [he and L] were doing was drugs, and that's all [he] would go to work for basically and spend [his] money on * * *." Father and L's life in Alaska was also marred by domestic violence. Father testified that his relationship with L was "rocky the whole time," and that he had pushed her down and held her down at times. In July 2004, L petitioned for a protective order against father on the grounds that father had physically threatened her, entered her home without permission, and stolen money. The petition was denied when neither party appeared for the hearing.

Father, L, and the two children left Alaska sometime in 2004 and headed south toward Seattle. They settled briefly in Tukwila, Washington, and, for a short time, father and L avoided drugs. But, in father's words,

> "[W]e realized that we moved into the heart of the drugs in Tukwila * * * and we just looked over our shoulder in our neighboring houses were drug dealers, so that's where it got really, really bad. Started using IVs, started doing real heroin, started doing speed, amphetamines, cocaine."

Father did not work during that time, and the family lived off an inheritance that L had received.

Father and L's six months in Tukwila also involved threats of violence and domestic violence. The threat of violence occurred after father sold "some bunk stuff" to someone who later returned to his home while the children were asleep and "threatened to rape [L], threatened [his] family." In March 2005, father was charged with assaulting L, and the court issued a no-contact order. After he was released from jail, and despite the no-contact order, father, L, and the two children left Tukwila and moved to Eugene.

Within two or three weeks of arriving in Eugene, father resumed using drugs. By June 2005, the family was staying at a shelter in Eugene. Both father and L were abusing drugs, and their behavior was erratic. They argued loudly in front of their children and in front of other families at the

shelter. Staff from the shelter testified that father was verbally abusive toward G. On more than one occasion, staff attempted to intervene with regard to father and L's drug abuse, and the parents were ultimately evicted from the shelter after testing positive for drug use.

On July 21, 2005, Eugene police officers responded to a report of a domestic disturbance at a church parking lot where father, L, and the children were living in a small trailer that was messy and "smelled like garbage." One of the officers interviewed L, who had two half-inch scratches on her right forearm, as well as redness on her neck. As father attempted to flee, he was arrested. According to father, he had confronted L about her "new boyfriend," and the confrontation escalated into a physical altercation. Father was jailed following his arrest and was indicted on domestic violence charges. He pleaded guilty to coercion, felony assault in the fourth degree, strangulation, and menacing. Father was sentenced to 18 months in prison.

In August 2005, the children were interviewed by a DHS intake worker. G disclosed that he had seen multiple incidents of domestic violence, including father's assault that resulted in his arrest. DHS filed a petition for dependency jurisdiction over G and N. In October 2005, the petition was granted, and the juvenile court took jurisdiction over both children. At that time, N was about two and one-half years old.

While in foster care, both children—and especially G—displayed troubling behavior. G, for example, was exceptionally aggressive and violent, smeared feces on the wall, and chewed through the side of a wooden bed. N's difficulties were considerably less severe. She was diagnosed with an adjustment disorder with anxiety in temporary remission, and she initially suffered from night terrors in which she would cry out and behave hysterically in bed. She also was more hyperactive than the typical child her age and demonstrated delayed speech, but she made significant progress during her time in foster care.[2] Day, a caseworker who worked with N and G, testified that N exhibited poor boundaries with strangers, which is typical of children with chaotic

---

[2] The record indicates that N (who did not speak Spanish) was initially placed in a foster home where the family spoke only Spanish, which likely contributed to her speech delay.

or unstructured backgrounds. The caseworker also testified that both children would benefit from a "very structured home" with predictable routines, and that the children struggled with uncertainty.

While father was incarcerated, he did not have any contact with the children. He did, however, make efforts toward treating his substance abuse. In June 2006, father completed an assessment for a treatment program while he was at a forest work camp. After he was diagnosed with cannabis dependence, opioid dependence, amphetamine dependence, and cocaine dependence, father embarked on a treatment program. During the time that he was in treatment at the work camp, father made "steady progress toward meeting his treatment goals and objectives * * *."

In late July 2006, father was released from the work camp, and on August 2, 2006, he entered into a service agreement with DHS. As part of that service agreement, father agreed to engage in drug and alcohol treatment; to provide random urinalysis samples; to complete anger management and domestic violence training; and to complete a psychological evaluation. Father also agreed to attend regularly scheduled visits with N.

Initially, father made good progress toward recovery and reunification. Father began attending the Bridge community treatment program, which involved counseling once each week and group meetings. His drug and alcohol counselor at that program, McClaflin, testified that father had presented "one of the best recovery plans that [she] had ever heard," and that father had a "really good understanding" of what changes were necessary to recover from drug abuse. Father also expressed interest in finding a program that would allow him to complete parenting and domestic violence training while he was undergoing drug and alcohol recovery, but McClaflin discouraged him from taking on too many things at once.

Father visited N and G once a week after his release. Williams, the DHS worker who observed those visits, testified that father was "friendly towards both kids. They were friendly, but [N] had a difficult time, kind of grasping the fact that he was her parent." Father brought appropriate food for them and engaged in appropriate activities with them.

Father testified that the children were very happy to see him and that they called him "dad" and ran to hug him during the visits. Williams, however, testified that she did not observe "very much affection as far as hugging or touching" from N, and that N called father by his first name rather than "dad."

Two days after his release from custody, father found work as a welder. Father was working 10 hours each day and occasionally on weekends. Father's drug counselor told father to ask to work fewer hours, but father did not request to work less.

Father made initial progress toward recovery and reunification, but he soon became frustrated and burdened by the stresses of balancing work, recovery, and his weekly visits. Just five days after completing the recovery plan that had so impressed his counselor, father "presented as agitated at the start of [their treatment] session[,] reporting that the UA procedures were unfair and too demanding." Two days later, father missed a treatment session without first calling to cancel. Two weeks after that, father was excused from his scheduled treatment. The counselor's notes state that father "had been reluctant to schedule an appointment[,] reporting that he had no time in his schedule to do so." Her notes further state: "Discussed this session was client's recent change in behavior in the group setting including the sarcastic comments and cross talking he does. He acknowledged the change in behavior and took some responsibility. We agreed to explore his schedule, stressors and treatment plan at this next appointment."

The following day, September 15, 2006, father tested positive for cocaine. Although he initially denied using cocaine, he later admitted to the use. According to father, the cocaine use resulted because he was overburdened:

> "I had a lot of things on my plate. I didn't know how to deal with them. My first time in treatment, I don't even know why I did it, you know. I can't even tell you why I did it. I just—it was being overwhelmed. Stressed out. Not knowing the things, how to deal with things that I not only had to talk to people, use my support group * * *."

McClaflin testified that father had difficulty managing his time and managing day-to-day activities, and that those

stressors triggered his return to cocaine. On October 26, 2006, the court revoked father's probation and sentenced him to prison.

While father was again incarcerated—this time from October 2006 until the first week of December 2007—father had no contact with either child. In April 2007, DHS filed a petition to terminate father's parental rights to N.[3] DHS alleged that father was unfit to parent N by reason of the following conduct and conditions:

"(a) Criminal conduct that impairs the parent's ability to provide adequate care for the child.

"(b) Incarceration that impairs the parent's availability to provide adequate care for the child.

"(c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that the parental ability has been substantially impaired.

"(d) Exposure of child to domestic violence.

"(e) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"(f) Mental, emotional, or psychological abuse of the child.

"(g) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"(h) Physical and emotional neglect of the child.

"(i) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

DHS also alleged that father's parental rights should be terminated based on neglect.

---

[3] DHS also filed a petition to terminate L's parental rights to N and G. L's parental rights are not at issue in this appeal.

From January 2007 until one week before the December 12, 2007, termination hearing, father was amenable to relinquishing his parental rights. However, father's willingness to relinquish his rights was predicated on adoptive placement with his sister in Georgia. When that placement fell through, father contested the petition.

On December 5, 2007, one week before the termination hearing, father was released from prison on "transitional leave." Father argued at the hearing that his rights should not be terminated in light of the progress toward recovery and reunification with N that he had made while in Powder River Correctional Facility and during the brief period of time after he had been released.

The evidence demonstrates that, at Powder River, father again engaged in a drug treatment program for cannabis dependence, cocaine dependence, and opiate dependence. Progress reports from that treatment program indicate that father was making progress toward his plan objectives. Father also completed a 16-hour anger management class and reported to his probation officer in November 2007 that he had made great progress in his ability to manage his own anger and reactions, but needed a more intensive class to meet DHS requirements.

At Powder River, father worked in the kitchen. In May 2007, he expressed frustration with that job. Father's probation officer's notes indicate that father wanted "another position w[ith] less hours as [father] admits he does feel overwhelmed * * *."

After father was released from Powder River, he moved into an Oxford House, which is a recovery home in which residents live together as a family and support one another in their recovery. To stay at the house, father was required to pay $350 per month in rent. The coordinator at the house, Sunderland, testified that father was "very passionate about wanting to be reunited with" N. As far as Sunderland knew, father was "going to his AA meetings, his 12-step groups, and interacting pretty well." That testimony was based on father's one week of living at the Oxford House.

Father also began attending a young fathers program with Catholic Community Services. The program includes a 12-week parenting group designed to address the needs of young fathers, including components on discipline, child development, communication, nutrition, and stress management; an ongoing weekly support group for fathers; and one-on-one support through a case manager. Between December 5 and the termination hearing on December 12, 2007, father had met with his case manager, Zamudio, on four occasions. At the time of the hearing, Zamudio had not completed father's assessment, but he testified that, with Zamudio's help, father would be able to meet his own needs within three months. Zamudio did not know anything about N's specific needs.

After the termination hearing, the trial court denied DHS's petition to terminate father's parental rights. In doing so, the court orally explained its decision:

"The key determination that weighed on my mind in evaluating the testimony and the evidence and the record was a change—and I think a material change—in circumstances during the time in which [father] served in prison this last time of incarceration, the self-initiation and programs that he engaged in, and the progress made immediately after being released about a week and a half ago.

"The interesting circumstances and the posture that this case was presented to me last week, I think, made it very difficult for the state to establish by clear and convincing evidence that this change in [father's] behavior and motivation was fleeting."

The trial court then remarked on the credibility of the various witnesses:

"Let me, first, set out that I found that the witnesses presented here, whether on behalf of the state or [father], were thoughtful, meaningful, and genuine in their testimony about what they believed, what they perceived, and that they cared very honestly about the welfare of the children.

"* * * * *

"I also find that [father] was credible in his testimony by virtue of his demeanor, particularly with respect to his

expressions of motivation to clean himself up, get back on track, and remain sober."

The court adopted certain of DHS's proposed findings of fact "without modification," adopted other paragraphs "with some degree of modification," and did not adopt the remaining proposed findings of fact. Although there is some inconsistency among those various findings, the court ultimately explained that it had

"decided not to terminate [father's] parental rights * * * by virtue of [his] committed expressions of getting [himself] back on track. And again, I underscore that [ ] one of the reasons termination of parental rights was denied is because the state has not proved by clear and convincing evidence that [father is] incapable of [reintegrating N] back into a home in the near future."

In that regard, the court explained that father had begun reasonable efforts at reintegrating N, and that DHS had not produced sufficient evidence to demonstrate that reintegration would not be possible:

"I find a lack of evidence from the state on this issue, including a lack of any psychological evaluations to suggest that [father] cannot adequately integrate [N] back into a home.

"I point this out because, in my review of the case law, in circumstances similar to that of [father's], much of the bases for supporting a termination of parental rights is substantially—was substantially more medical and psychological evaluations and attempts on the part of DHS to reintegrate the child back into a home. It just simply didn't happen here."

The court then denied the petition to terminate, and a judgment that incorporated its oral findings of fact (including the adopted and modified findings proposed by DHS) was entered.

On appeal, DHS argues that it proved by clear and convincing evidence that father was unfit by reason of his chemical dependency and history of domestic violence. DHS further argues that it was improbable that N will be integrated into father's home in a reasonable time. Finally, DHS argues that the trial court placed too much weight on father's

progress in the week before the termination hearing. For the reasons that follow, we agree with DHS.

■■ ORS 419B.504 governs the court's consideration of a petition to terminate parental rights on the ground of unfitness.[4] That statute

> "sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001) (quoting ORS 419B.504). The focus of both parts of the test for determining a parent's unfitness, as the court in *Stillman* explained,

> "is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."

*Id.* at 146.

■ Whether a parent's conduct or condition has had a seriously detrimental effect on the child is a "child-specific"

---

[4] ORS 419B.504 provides, in part:

"The rights of the parent * * * may be terminated as provided in ORS 419B.500 if the court finds that the parent * * * [is] unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change."

inquiry that calls for "testimony in psychological and developmental terms regarding the particular child's requirements." *Id.* That is, "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities." *State ex rel SOSCF v. Wilcox,* 162 Or App 567, 576, 986 P2d 1172 (1999).

■■ Moreover, a parent's fitness must be measured as of the time of the parental rights termination hearing. Thus, evidence that grounds for termination may have existed previously, without evidence that those grounds continued to exist at the time of the hearing, is insufficient to support the conclusion that parental rights should be terminated. *Stillman,* 333 Or at 148-49. Finally, the court must also find that termination of parental rights is in the best interest of the child. ORS 419B.500.

■■ The state must prove the facts establishing unfitness by clear and convincing evidence. ORS 419B.521(1). To the extent that the state proves particular conduct and conditions, they are not viewed in isolation but rather in combination to determine whether a parent is presently unfit. *See, e.g., State ex rel Dept. of Human Services v. Radiske,* 208 Or App 25, 49, 144 P3d 943 (2006).

■ Our first inquiry, then, is whether father is "unfit by reason of conduct or condition seriously detrimental to the child." ORS 419B.504. That, in turn, involves a two-part inquiry: The court must find that (1) the parent has engaged in some conduct or is characterized by some condition, and (2) the conduct or condition is "seriously detrimental" to the child.

On this record, we conclude that DHS has proved both prongs of the unfitness inquiry by clear and convincing evidence. DHS has proved that father has various conditions—cannabis dependency, opiate dependency, and cocaine dependency—and has engaged in conduct—domestic violence—that are in various stages of treatment but that, in combination, render father presently unfit to parent any child, particularly a child with N's anxiety issues and need for constant supervision. Father does not dispute that his substance abuse has been seriously detrimental to N in the past. For example, when in the throes of his addiction, father

neglected N's needs and associated with individuals who directly threatened the safety of his family. The evidence in the record demonstrates that, although those chemical dependencies were in the process of being treated, father had not yet completed treatment that would provide any degree of certainty that father would maintain his recovery. Moreover, although father took a 16-hour anger management class, he has not engaged in any treatment specifically aimed at domestic violence—an issue that has permeated his previous relationships.

■ The more difficult question, given the timing of the termination hearing and the stage of father's treatment upon his release from prison, is whether N's integration into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. Whether a particular time for reintegration is "reasonable" depends on the particular needs of the child. ORS 419A.004(20) (a "reasonable time" is a "period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments").

As noted above, the evidence demonstrates that father was still in the process of being treated for chemical dependency. The trial court was convinced that father would complete that treatment and maintain sobriety, based primarily on the court's factual determination that father was earnest in his desire to achieve recovery and to reunify with N. Although we, like the trial court, find father's efforts to be commendable, father's *intentions* are not the only predictor of success in this case. Father has been addicted to drugs for more than half of his life. The only sustained periods in the past 10 years of his life in which he has been drug-free have been in prison. McClaflin, father's current drug counselor, testified that treatment for chemical dependency while incarcerated is "very, very, very different" from treatment outside prison. That is, people who are incarcerated do not "hav[e] to deal with any of their normal day-to-day type activities. So they're gaining information about their use, they're in a supportive environment, but they're not actually having to walk it out." In McClafin's experience, "usually folks kind of tend to go backward a little bit as soon as they get released from incarceration, and then we have to start moving forward

again." That was the case with father when, in 2006, the stresses of everyday living, work, recovery, and visitations compromised the progress that father had made with his chemical dependency while incarcerated. The stress was such that father relapsed. According to McClaflin, it generally takes six months to a year to be confident in a person's recovery status.

The past, in this case, is the best predictor of father's future success; we find it to be highly unlikely that father would be able to balance the stresses of everyday living, work, recovery, and domestic violence and parenting training, and to progress to the point where integration is possible, in less than six months. Thus, we conclude, given father's extensive drug abuse history and the testimony of McClaflin, that father is at least six months away—likely more—from achieving a level of recovery that would permit the reintegration of N into father's home.

Six months to a year is too long for N to wait, particularly given how speculative reintegration is at this point. At the time of trial, N had been in DHS custody for half of her life. Although she had done well in foster care, she needs stability and permanence at this stage of her development, as well as the opportunity to form lasting attachments. Because of her anxiety, N has a heightened need for a structured, consistent, and stable routine in the immediate future. For that reason, we find that integration into father's home within a reasonable time is improbable.

■ Finally, we conclude that termination of father's parental rights is in N's best interest. The evidence in the record is that N is very adoptable and has done "extremely well" in foster care. By contrast, she had no contact with father the year before the termination hearing, and very little contact with him during the year before that. The evidence further demonstrates that N, though not presenting the same parenting challenges that G presents, still requires "a really high rate of supervision" and would benefit greatly from a "very structured home" with predictable routines. For all of those reasons, we find that it is in N's best interest that father's parental rights be terminated and that DHS move

forward with an adoptive placement that will provide N with the stability, permanency, and supervision that she requires.

Reversed.