Argued and submitted November 7, 2011, affirmed February 29, petition for review denied June 28, 2012 (352 Or 170)

In the Matter of
C. M. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

C. M. M.,
*Respondent,*

*v.*

T. M. M.,
*Appellant.*

Clatsop County Circuit Court
09J5718;
Petition Number 04J5718;
A147854 (Control)

In the Matter of
G. J. R. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

G. J. R. M.,
*Respondent,*

*v.*

T. M. M.,
*Appellant.*

Clatsop County Circuit Court
09J5719;
Petition Number 04J5719;
A147855

In the Matter of
L. R. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

L. R. M.,
*Respondent,*

*v.*

T. M. M.,
*Appellant.*

Clatsop County Circuit Court
09J5720;
Petition Number 04J5720;
A147856

In the Matter of
W. H. C., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

W. H. C.,
*Respondent,*

*v.*

T. M. M.,
*Appellant.*

Clatsop County Circuit Court
09J5721;
Petition Number 04J5721;
A147857

In the Matter of
N. A. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. M. M.,
*Appellant.*

Clatsop County Circuit Court
09J5722;
Petition Number 02J5722;
A147858

273 P3d 322

Shannon L. Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Megan L. Jacquot filed the brief for respondent children, C. M. M., G. J. R. M., L. R. M. and W. H. C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

### WOLLHEIM, J.

Mother appeals judgments terminating her parental rights with respect to five of her children: N, C, G, L, and W. She argues that, whatever her history of opiate dependence and resulting neglect, she was not unfit to parent as of the time of the termination hearing. She further argues that the Department of Human Services (DHS) failed to present child-specific evidence that N, C, G, L, and W, whose ages at the time of the termination hearing ranged from 13 to 2, could not be reintegrated into her home within a reasonable time. On *de novo* review, ORS 19.415(3)(a), we affirm.

## I.  BACKGROUND

A.  *Facts* [1]

  1.  *Family history with child welfare agencies*

Mother and father have six children together, five of whom—N, C, G, L, and W—are the subject of these termination proceedings; their sixth child, B, was born during the course of the termination hearing. In January 2008, the family (other than W and B, who were not yet born) were living in Indiana. The Indiana Department of Child Services (DCS) received a report that father had been arrested, that mother had warrants out for her arrest, and that the family's home was unsuitable for children. A DCS case manager, Vieck, went to the home on the day of the report, but no one was there. The family's landlord let Vieck into the home, and she found it to be in complete disarray—clothes and trash scattered throughout; mouse feces on the countertops; and mice living in piles of laundry. At that point, Vieck tried to locate the family but was notified the following day that mother had been arrested. The children, Vieck learned, were living with their maternal great aunt in a nearby city. The aunt herself

---

[1] To the extent that the trial court made credibility determinations as to witnesses in this case, those determinations appear to have been driven not by the demeanor of the witnesses but rather by the substance of the evidence. " '[T]o the extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination.' " *State ex rel Dept. of Human Services v. R. T.*, 228 Or App 645, 655, 209 P3d 390 (2009) (quoting *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994)).

had a history with DCS—a substantiated sexual abuse allegation with regard to one of the aunt's children—and DCS removed the children and placed them in foster care.

Mother's parenting difficulties in Indiana stemmed from what was, by 2008, a longstanding addiction to opiates. Mother first used opiates after a gall bladder surgery in 2001, and later used pain medications in connection with various other health problems. But mother also turned to opiate use to deal with the stress of her conflicts with father, her relationship with her family, and financial pressures. By 2005, mother was using opiates on a daily basis, and was diverting a significant percentage of the family's scarce resources to her drug habit; in fact, while in Indiana, mother's addiction reached the point at which she was trading sex for drugs.[2]

In July 2008, DCS returned the children to mother and father. Shortly after the children were returned, two of them suffered serious injuries; L, the youngest at that time, severely burned her hands on the oven and was taken to the emergency room, and N, their oldest, required stitches after getting into father's tools and cutting himself with a knife. Nonetheless—and despite concerns on the part of service providers that mother was continuing to abuse opiates—DCS closed its case on the family in December 2008.

In January 2009, the family (now including W) moved to Astoria, Oregon, so that mother could be closer to her family and father could pursue an employment opportunity that never materialized. They left behind all of their belongings, taking, in father's words, only the clothes on their backs. They had no plans for suitable housing. The seven of them initially stayed in a two-bedroom apartment with three of mother's family members. At some point during that stay, L suffered another severe burn—purportedly from hot water from the tap or water from a pot on the stove. The blister from the burn covered the back of L's hand, but mother, fearing

---

[2] Father reported to a DHS caseworker that mother had significant substance abuse problems and was prostituting herself for drugs, and that he had come to Oregon hoping to escape that lifestyle. At the termination hearing, father claimed that his report was a lie and that he had said that simply to better his chances of winning a custody battle with mother. Suffice it to say that father's initial report—and not his recantation—is the more credible considering other evidence in the record.

that hospital personnel would report the injury to DHS, elected to treat it at home.

Mother also found herself unable to escape opiate addiction. After moving to Oregon, mother routinely engaged in drug-seeking behavior at emergency rooms and urgent care clinics. Between January 2009 and August 2010, mother sought urgent care on more than 30 occasions, sometimes appearing at different hospitals and clinics on the same date. Mother often complained of dental pain and, despite being repeatedly advised to visit a dentist or local doctor, reappeared in emergency rooms and medical clinics seeking opiates for the same dental pain. On other occasions, mother complained of pain levels that doctors described as disproportionate to what they would expect from her exams, and mother became hostile with medical professionals who refused to prescribe her pain medications. When she was not able to obtain pain medication, she went into withdrawal, had difficulty getting out of bed, and was unable to parent.

In March 2009, the family moved into their own two-bedroom apartment. Thereafter, on March 16, mother and father had an intense argument that began, according to father, because members of mother's family had left baggies of methamphetamine on the floor of the apartment where children could reach them. Mother, in the course of the dispute, cut her own wrist with a razor blade. Police responded and took mother to the hospital, where she was placed on a "mental health hold."

The police subsequently contacted DHS about possible drug use and child neglect by mother and father. (On the night that mother cut herself, father told police that mother was spending $100 per day on prescription narcotics and had been drinking excessively.) While DHS was investigating that referral, mother was arrested in Seaside for shoplifting lunch meat and a can of baby formula. A few days later, mother and father failed to show up for urinalyses that they had agreed to provide. The following day, a DHS investigator attempted to deliver a playpen for W to sleep in, but no one was home. The investigator made phone contact, however, with one of the family's friends, who had been trying to help the family obtain furniture for their apartment. The

friend reported concerns to the investigator that mother was abusing prescription medication and was "high when she was around the kids." On March 26, 2009, DHS removed the children from the home and placed them in foster care.

## 2. *Children's behavior and needs*

Mother does not dispute that her substance abuse and consequent neglect were seriously detrimental to her children. Mother and father's oldest child, N, had just turned 12 at the time he was placed in foster care in Oregon. He was diagnosed with attention deficit hyperactivity disorder (ADHD) and "adjustment disorder with disturbance of conduct," and was provisionally diagnosed with "disorder of written expression." He also exhibited "parentified" behavior. Beth Erickson, one of the social workers who provided mental health services to the children, explained that "parentified" behavior results when parents fail to meet their children's basic needs, thereby causing the children to step into the role of parent. Parentified behavior is damaging to a child, Erickson explained, because the child is forced to put the needs of others first, before the child is developmentally able to do so; the child also may become distrustful of adults and have difficulty forming relationships with them.

N was placed, for a time, in a different foster home from his siblings. He exhibited oppositional and defiant behavior, had difficulty in school (including suspensions and weekly detention), and engaged in antisocial behaviors, including physical altercations. Because that foster placement was unable to create enough structure to keep him away from his chosen peer group (who were also engaged in some of those antisocial behaviors), N joined his siblings in July 2010 at a different, more structured foster placement. By the time of the termination hearing he was more stable and was receiving "outstanding grades."

Mother and father's second oldest child, C, exhibited some of the same parentified behavior as N. In addition, C, who was eight at the time of the termination hearing, somaticized her anxiety, experiencing stomachaches, headaches, nausea, and wetting her pants. C's therapist, Dana Crane, diagnosed her with an adjustment disorder with mixed emotions and conduct. Erickson, who also evaluated C, testified

that she was in the "clinical range for obsessive compulsive problems and post-traumatic stress problems." C exhibited nightmares, worry, and confusion about where she was supposed to be; she was also defiant at times, engaging in exaggeration and lying. According to Crane, by the time of the termination hearing, C was making "a good adjustment" but required "structure, predictability, [and] safety" to sustain that progress. Erickson, meanwhile, testified that C needs

"a parent who's really rather sophisticated in being able to balance all of that, that piece of handling your own emotions and also being able to help [C], you know, feel safe and secure and to give her some coping skills so that her anxiety can decrease and be able to, you know, create an environment or get her in a place that, you know, lets her calm down and not feel so anxious.

"And then as far as the PTSD, the post-traumatic stress issue, of being able to identify what things potentially could trigger that, be able to identify specifically any sort of behaviors or kind of physical symptoms that may indicate that she is having a post-traumatic stress response. And also, you know, being able to provide an environment that will help, you know, her get out of that piece—that place and to feel calm and to feel safe and secure."

G, who was six at the time of the termination hearing, was diagnosed with an "adjustment disorder with disturbance of emotions and conduct, chronic." G had previously been diagnosed with acute stress disorder and post-traumatic stress disorder. Crane, who provided the more recent diagnosis, explained that G struggles with self-soothing and has difficulty relaxing and adjusting to change. When Crane first evaluated her in April 2009, G was masturbating nightly to fall asleep. G also experienced severe mood swings around visitation with her parents, and her foster parent described her as "aggressive, * * * mixed up [and] confused, if things are too intense for her." G, in particular, has experienced "confusion about where she stands in the family and where she fits in the family * * *." Crane opined that G has attachment issues, is particularly sensitive" to change, and is "going to probably continue to act out until she feels safe and secure, and until she knows where she's going to be."

L was three at the time of the termination trial. She exhibited "classic symptoms of attachment issues," including "explosive anger and mood swings, scattered focus, anger, defiance, smearing feces * * *, confusion, self-harm, [and] harm to others." Crane, her therapist, opined that those symptoms were caused by "a long history of placement in various foster care homes, witnessing domestic violence, just no opportunity to attach to any adult." Crane also diagnosed her with an "adjustment disorder, unspecified"—"unspecified," Crane explained, because she could not "say it's just anxiety or it's just conduct or it's just depression." L, like G, used masturbation as a soothing device; she masturbated frequently throughout the day. Crane also gave L a "rule out" diagnosis for a "reactive attachment disorder." She testified that L will need a parent who "is not going to react to her anger and her outbursts" as well as "consistency, predictability, good structure * * * [g]ood place to live, no more moves, no more changes."

Mother and father's fifth child, W, has spent all but a few months of his life in foster care. According to his initial foster parent, when W first entered foster care, he did not "have the normal reaction a baby would have that's been stimulated and talked to." In February 2010, W demonstrated some attention deficit/hyperactivity problems. He has also had health problems with his eyes, both of which were "lazy eyes." He had eye surgery and requires ongoing medical checks every three to six months to ensure that his eyes are developing correctly. Unlike the other children, W has little if any attachment to mother or father.

3.  *Mother's efforts at reunification*

    a.  Drug recovery

In early September 2009, mother entered a detoxification center in Portland and spent two weeks there. Upon leaving that center, mother entered an inpatient program at Astoria Pointe. She began a Family Drug Court program approximately a month later. At that time, she displayed "strong motivation to understand her addiction, [and] learn about sobriety and how to maintain her recovery." She successfully completed her inpatient treatment and was discharged on December 15, 2009.

After being discharged, mother began aftercare groups at Astoria Pointe and outpatient treatment at Lifeworks Northwest. She struggled to keep her appointments, however, and missed more than half of her individual and group treatment sessions. In March 2010, mother moved to the Astoria Rescue Mission, a shelter and faith-based substance abuse recovery program where father was also living.[3] Around the same time, mother was reevaluated by Dr. Howard Deitch, a psychologist. Deitch, in October 2009, had diagnosed mother with Opioid Dependence (prescription pills), reported early full remission, in a controlled environment; "Adjustment Disorder with Mixed Anxiety and Depressed Mood, in reported remission and controlled by medications"; and a "Rule-Out Personality Disorder [Not Otherwise Specified]" based on "Antisocial, Narcissistic and Passive-Aggressive Personality Features." In March 2010, Deitch again diagnosed her with Opioid Dependence, reported early full remission, in a semi-controlled environment, and an adjustment disorder mostly in remission and controlled by medication. He stated that she had made progress with regard to her antisocial, narcissistic, and passive-aggressive personality features, but that "[t]here remain concerns about the consistency of her judgment and maturity." "Her long-term prognosis for being a consistently stable and protective parenting resource for her children," Deitch opined, "remains guarded."

Deitch's diagnosis of mother in early full remission was based solely on mother's self-report. He explained that "dependence" is more severe than abuse. "[I]f a person has not used a substance for more than a year, it's sustained full remission"; at less than a year (but more than a month), Deitch diagnosed her instead at "early full remission." The evidence, however, is that mother's self-report was not entirely accurate.

By the time of her March 2010 evaluation with Deitch, mother was again seeking pain medication at emergency rooms and urgent care clinics. In April 2010, mother was terminated from the Family Drug Court program for

---

[3] The Astoria Rescue Mission has a men's recovery program and a separate women's shelter.

failing to comply with program rules and for engaging in drug-seeking behaviors. In May, mother moved out of the Astoria Rescue Mission and into an apartment. In June, Lifeworks terminated her from the outpatient treatment program because she was "non-compliant with treatment recommendations." Between June and July 2010, mother was twice diagnosed with "drug seeking behavior" by an urgent care nurse practitioner and also tested positive for opiates.

Feeling herself "slipping in th[e] direction" of abuse, mother returned to the Astoria Rescue Mission, and she began an outpatient treatment with Clatsop Behavioral Healthcare on July 21, 2010. However, mother again missed more than half of her treatment sessions between July and the termination hearing. Some of those sessions were missed because of scheduling conflicts with her visitation with her children, and some because of pregnancy related health issues.

In late July 2010, mother also received a prescription for Subutex, a medication used to prevent withdrawal symptoms from opiate addiction. Subutex, according to the evidence in the record, contains the opiate buprenorphine, which is itself addictive and is sold and traded illegally on the streets. Indeed, mother herself reported buying Suboxone (another trade name for buprenorphine) on the street for $10 per pill until she obtained her prescription. In October 2010, mother sought additional Subutex pills, claiming that she had been robbed by a coworker and that her remaining pills had been taken. On November 17, 2010, mother asked that her prescription be increased from two pills to three pills per day, and her doctor agreed to increase the prescription.

According to mother, as of the time of the termination hearing in December 2010, she had not used or sought any drugs other than Subutex for a period of five months, with two exceptions: In August 2010, mother required staples for a scalp laceration and took pain medication for four days after the injury; on December 6, 2010, mother gave birth to B and took pain medication for two days following the birth. Apart from those two occasions, mother has resided at the Astoria Rescue Mission, taken prescribed Subutex, and abstained from drug-seeking behaviors.

### b. Visitations

In the months immediately following the removal of her children, mother returned to Indiana on three occasions—once for a month—and missed "significant opportunities" to visit her children. When she did visit with the children, mother had difficulty simultaneously parenting all of the children during visitations—particularly W. For instance, mother would bring a pile of meat and cheese for lunch, which W, who had no teeth, would pick up from the floor; L would gorge herself on food and drink until she vomited. As of April 2010, it appeared that mother still did not understand the nutritional needs of her children and was storing spoilable items in a toy bin rather than the refrigerator. C's anxiety and related symptoms escalated around visits, and W expressed a desire to leave the visits, advancing toward the door and saying "home" and "mommy."

Eddleman, who observed the visitations, testified that mother "loves her children" and has "a very nurturing, kind side to her." At the same time, "she has a hard time setting boundaries and then enforcing them":

> "Even when they're boundaries that DHS has set she has a hard time enforcing them. She will argue in visits about the boundaries even though they've been explained to her beforehand and talked about and worked through and then she understands. But then somehow in the visit it becomes that she doesn't understand and that she doesn't want to enforce it with her children."

In July 2010, mother failed to arrive for two consecutive visits, causing distress for the children. Also that month, Eddleman referred mother for a "family decision meeting" to address visitation issues, particularly safety issues that were repeatedly arising. Visitation was restructured so that mother visited with each child individually after July, and mother did "very well one on one with her children." Mother unquestionably has a "strong and loving bond" with N, C, G, and L, and the children respond positively to her; but, as previously mentioned, mother and W do not share the same bond.

## B. *Procedural history*

In April 2010, DHS filed its amended petitions to terminate mother's parental rights as to N, C, G, L, and W. DHS alleged that mother's rights to each child should be terminated on the grounds that mother was unfit by "reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including but not limited to the following":

"(a)  Addictive or habitual use of intoxicating liquors or controlled substances to the extent that the parental ability has been substantially impaired[;]

"(b)  Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible[;]

"(c)  Failure to learn or assume parenting and/or housekeeping skills sufficient to provide a safe and stable home for the raising of the child[;]

"(d)  Sexual conduct toward a child[;]

"(e)  An emotional illness, mental illness, or mental retardation of such nature and duration as to render the parent incapable of providing care for extended periods of time[;]

"(f)  Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible[;]

"(g)  Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

After an 11-day trial (that also involved father's parental rights[4]), the juvenile court terminated mother's parental rights to each of the children. The court found that the state had proved all the allegations set out above, except for sexual conduct toward a child.[5] Mother timely appealed those judgments.

---

[4] Father's parental rights are the subject of a separate appeal, also decided this date. *State ex rel Dept. of Human Services v. W. S. C.*, 248 Or App 374, 273 P3d 313 (2012).

[5] The allegation of sexual conduct is not at issue on appeal, and we therefore omit discussion of that issue and the state's evidence.

## II. ANALYSIS

Termination of parental rights based on unfitness is governed by ORS 419B.504. As the court explained in *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001), the statute

"sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

(Quoting ORS 419B.504.)

The focus of the unfitness inquiry is on "the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Id.* at 146. Thus, a court "first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child." *Id.*

"Whether a parent's conduct or condition has had a seriously detrimental effect on the child is a 'child-specific' inquiry that calls for 'testimony in psychological and developmental terms regarding the particular child's requirements.' " *State ex rel Dept. of Human Services v. A. T.*, 223 Or App 574, 585-86, 196 P3d 73 (2008), *rev den*, 345 Or 690 (2009) (quoting *Stillman*, 333 Or at 146). Moreover, to the extent that the state proves particular conduct and conditions, they are not viewed in isolation but rather in combination to determine whether a parent is presently unfit. *A. T.*, 223 Or App at 586.

Thus, we first consider whether mother is unfit—*i.e.*, whether (1) she has engaged in some conduct or is characterized by some condition that is (2) "seriously detrimental" to her children. And, on this record, we find by clear and convincing evidence, ORS 419B.521(1), that mother's conduct (opiate abuse) and condition (opiate dependence) render her presently unfit to parent her children.

There is no dispute that, when mother is in the cycle of abuse and withdrawal that has characterized her opiate dependence, mother is unable to put the needs of her children before her own and that, as a result, each of her children has suffered serious detriment. Mother argues, however, that "to prove 'addictive or habitual use of * * * controlled substances' as a basis for termination of a parent's parental rights, the department must prove at a minimum that the parent is likely to abuse controlled substances in the future, such that it would impair her parenting ability." (Citing *State ex rel Dept. of Human Services v. A. L. S.*, 228 Or App 700, 719, 721-22, 209 P3d 817, *rev den*, 347 Or 43 (2009)). According to mother, her "initial success in treatment, her demonstrated ability to recognize and address potential relapse, and the new circumstance of her treatment with Suboxone" make historical evidence of her abuse too slight to prove a likely relapse.

Having reviewed the entire record, we disagree with mother's view of her success in treatment. As noted above, after mother was discharged in December 2009 from inpatient treatment, she immediately lapsed. She had poor attendance at aftercare groups, missing more than half of her individual and group treatment sessions; she was soon engaged in drug-seeking behavior at emergency rooms and urgent care clinics; she was terminated from the Family Drug Court program; and she moved out of the Astoria Rescue Mission and into an apartment. Within two months of moving into her own apartment, mother was terminated from her Lifeworks outpatient treatment program for noncompliance, was twice diagnosed with "drug seeking behavior" by an urgent care nurse practitioner, and tested positive for opiates. To mother's credit, she then began outpatient treatment at Clatsop Behavioral Healthcare in late July 2010, but her attendance did not improve; she again missed more than half her treatment sessions.

Between July 2010 and the termination trial culminating in December 2010, it appears that mother was not actively abusing opiates, due in significant part (if not predominantly) to her use of an opiate blocker, Subutex, as well as her residence at the Astoria Rescue Mission, where her use of Subutex was monitored. Neither of those circumstances, however, suggests that mother is presently fit to parent any of her children, or will be in the near future.[6] Two months before the termination trial, mother was requesting that she be prescribed *more* Subutex; in other words, her opiate cravings were not subsiding and she was actually getting an increased dosage of Subutex rather than being weaned from it. While we, like the trial court, are hopeful that mother might be able to sustain her recovery, the risk that she will relapse is very real; indeed, Deitch, the expert who evaluated mother, testified that mother would need to maintain a year of sobriety before she could even be considered as a parental placement. Importantly, mother has thus far maintained her recovery while living in a women's shelter without the stresses, financial and otherwise, of parenting multiple children; in the past, mother has relapsed almost immediately upon leaving structured treatment environments and, up to the time of the termination hearing, demonstrated little ability to even reliably attend outpatient treatment.

Having concluded that mother's opiate dependence and abuse render her presently unfit to parent, we must next consider whether "integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504. That inquiry—whether a particular time for reintegration is "reasonable"—depends on the specific needs of the particular child at issue. *See* ORS 419A.004(20) (a "reasonable time" is a "period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments").

At the very earliest (assuming no further relapses), the evidence is that mother would not have been able to be

---

[6] By "presently," we refer to the time of the termination trial. We similarly use the present tense to describe the state of things as they existed at the termination trial.

considered as a parenting resource for her children until seven months after the termination trial. That time frame—optimistic as it was—was not a "reasonable" time given the particular needs of mother's children, each of whom had specific and immediate needs for permanency as a result of neglect by their parents.

N, 13 at the time of the termination trial, had been in and out of foster care placements in both Oregon and Indiana since 2008. N, as described above, has both ADHD and "adjustment disorder with disturbance of conduct"; he also is distrustful of adults and exhibits "parentified" behavior. Just becoming a teenager, N requires immediate stability and permanency before the window closes on his ability to have a childhood and learn to form trusting attachments with adults and peers. Kathleen Scully, a behavioral therapist who counseled N, explained that N "had multiple placements out of home, disruptions from school, and he's 13. He's at that age now where children really need to have structure. So I think the more stable and permanent the environment for him, the better." She continued,

> "And the one thing I took away from his files was just a sense that he really needs to be a child and have his childhood. He has—it appears to be a lot of empathy and compassion, but I don't see a lot about just being a 13-year-old or a 14-year-old. And so to me that emotional part has not been allowed to develop."

Moreover, because of N's adjustment disorder, additional changes cause particularly high stress for him, putting him at risk of regression. Scully agreed that merely moving again could cause him to decompensate:

> "Yeah, just that in itself—and that actually affects most children with adjustment disorder, a move, a new school teacher, a substitute, all of that. It doesn't take much."

N's needs for a permanent, stable home were echoed by Deitch and Erickson. Erickson, in particular, testified that N's record's from Clatsop Behavioral Healthcare

> "reinforced his need for permanency. I mean, he is at a very crucial age, given that he's 12. I mean, he's on the cusp of becoming a teenager. And one of the main jobs of being a teenager is learning some sort of independence and kind of

testing the boundaries and testing the rules, the understanding and knowing that there's actual—an actual adult who's going to care about you, who's going to still set some limits with you[.] * * *

"And he's really—he really at this point needs someone who can establish that piece for him so that he can learn how to be, you know, independent but still be in—you know, be able to be in a group and get along with peers and form good, solid, healthy relationships with others."

According to Erickson, even a six-month delay in permanency would be detrimental to him:

"[E]ven with [N] as well, because like I said earlier about where he is at currently and what he needs to be doing at his age and being on the cusp of being a teenager and form an identity for himself and kind of testing the limits and the rules. He needs to have an established person now so that he can start working on that."

The three girls, C, G, and L, also need immediate permanency. C and G have adjustment disorders and anxiety issues, and both are distrustful of the ability of adults to protect and care for them. Erickson testified that C's disorders can be traced to a

"combination of being neglected. It's a combination of having several disruptions, of being in foster care and returning to parents and going to foster care and returning to parents, and having, you know, just kind of in her younger years when, you know, development and attachment and relationships are really being formed, having that constantly disrupted, where she never actually fully got to complete any of those cycles or those developmental pieces."

C has expressed her own need for permanency, stating that she did not "want to go back and forth anymore." G, who likewise had an adjustment disorder, suffered particular "confusion about where she stands in the family and where she fits in the family * * *." Her therapist, Crane, opined that G is "particularly sensitive" to change, and is "going to probably continue to act out until she feels safe and secure, and until she knows where she's going to be." L, the youngest of the girls, suffered from attachment issues and exhibited explosive anger, mood swings, defiance, smearing feces, and harm

to herself and others. Crane, testified that L needs "no more moves, no more changes," and that, given her particular needs, six months to a year is too long to wait for permanency.

Erickson likewise testified that another six months was simply too long for any of the younger children to wait for permanency, given their emotional and developmental needs and their ability to form lasting attachments:

"No, I don't think that that's a reasonable time for any of these kids to wait, especially for the younger children. You know, their current development is based on kind of that attachment relationship and, you know, learning, you know, emotional regulation and actually continuing just on the general path of development. It's all based on having a relationship with a primary caregiver.

"And having to wait six months to a year delays, you know, kids' ability to move on that spectrum, and especially if you're disrupting these kids from a care—a current caregiver with whom they have a relationship and attachment and a bond. Any time that gets disrupted, that delays children's development. That delays their emotional piece because they essentially have to put everything on hold to reestablish a relationship with the caregiver.

"Even if it is someone that they are familiar with, they still have to start from square one of, okay, can you meet my basic needs. You know, will you respond to me if I cry? Will you give me food? Will you make sure I have enough sleep? Those are those basic needs that have to get addressed first and established. And I think waiting another six months to a year would be really detrimental to all the kids."

Indeed, in Erickson's view, by the time of the termination trial, it was already "outside the time frame of what [she] would have deemed to have been reasonable for these children, given their developmental needs[.]"

Erickson's testimony has added significance with regard to W, the youngest child. W has spent almost all of his life in foster care, has not closely bonded with either mother or father, and refers to his foster parents as "mommy" and "daddy." In order to successfully reintegrate into mother's

home, W would have particular difficulties putting "everything on hold to reestablish a relationship with the caregiver"; in W's case, he would also be severed from the foster parents who, for the most part, are the only parents he has known for most of his life.

The particularized evidence of the children's needs for permanency, stability, and attachment, along with expert testimony regarding the reasonableness of delay as to each of them, distinguishes this case from *Dept. of Human Services v. T. C. A.*, 240 Or App 769, 248 P3d 24 (2011), which mother relies on heavily in her brief. In *T. C. A.*, there was expert testimony that the mother, a recovering drug addict, might have been able to resume parenting her children in approximately six to 18 months. That, however, is all that the record showed with regard to reintegration:

> "DHS did not show that mother would be unlikely to achieve sobriety or otherwise meet its burden to prove that it was improbable that mother would be able to provide a safe home for the children in that timeframe. Ultimately, the problem here is that the record is devoid of evidence regarding how such a delay in achieving permanency would affect the children's emotional and developmental needs or their ability to form and maintain lasting attachments."

*Id.* at 781. We acknowledged that "the delay that the children have experienced is troubling" but ultimately held that we could not conclude "on this record, that it is improbable that the children can be reintegrated into mother's home within a reasonable time." *Id.*

As explained above, the record here is not "devoid of evidence" regarding the children's needs for permanency. And, based on that evidence, we agree with the trial court's determination that it is improbable that mother would be able to integrate the children into her home within a reasonable time, given their particular emotional and developmental needs.

We turn, then, to the ultimate question: whether termination of parental rights is in the best interest of each child. ORS 419B.500. The evidence is that, although mother does not have a strong bond with W, mother and N, C, G, and

L are strongly bonded. Yet at the same time, mother has consistently demonstrated an inability to parent them—and, in particular, to parent them simultaneously. (Indeed, visitations had to be scheduled such that mother could visit them individually because she was unable to parent the children when they were all together.) Apart from their bond with their mother, the children are especially bonded to one another and, by all accounts, should stay together. All five children are currently in a foster placement together where they are doing well, and that foster placement is willing to adopt them. On this record, we find by clear and convincing evidence that it is in the children's best interests that mother's parental rights to each of them be terminated and that the children be freed for an adoptive placement together.

Affirmed.