Argued and submitted December 19, 2014, affirmed March 25, petitions for review denied June 4, 2015 (357 Or 324)

In the Matter of I. M. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. K.,
*Appellant.*

Lane County Circuit Court
09629J;
Petition Number 09629J05;
A157151 (Control)

In the Matter of K. J. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. K.,
*Appellant.*

Lane County Circuit Court
10220J;
Petition Number 10220J04;
A157154

In the Matter of I. M. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. M. G.,
*Appellant.*

Lane County Circuit Court
09629J;
Petition Number 09629J04;
A157272

In the Matter of K. J. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. M. G.,
*Appellant.*

Lane County Circuit Court
10220J;
Petition Number 10220J03;
A157273

346 P3d 1254

George W. Kelly argued the cause and filed the brief for appellant C. M. K.

Megan L. Jacquot argued the cause and filed the brief for appellant A. M. G.

Michael S. Shin, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

In this consolidated appeal, parents separately appeal judgments terminating their parental rights to their children, I and K, both four years old at the time of trial (though 10 months apart in age). The juvenile court determined that parents were unfit under ORS 419B.504 because they were unable to provide minimally adequate parenting at the time of trial and would not be able to do so within a time that was reasonable for I and K due to conduct or conditions that were not likely to change. On appeal, both parents contend that the court erred in concluding that the Department of Human Services (DHS) proved that (1) they were unfit at the time of trial, (2) the children could not be returned to their care within a reasonable amount of time, and (3) it was in the children's best interests to terminate parental rights. *See* ORS 419B.504 (establishing grounds for terminating parental rights for unfitness).

On appeal, father admits that he has a "mixed history as a parent" because of his recurring problems with drug addiction, but he asserts that he is a minimally adequate parent when sober. Further, he contends that the evidence at trial showed that he had been sober for many months, had completed drug and alcohol treatment, had engaged in parenting and domestic violence classes, and had established that, with the help of his extended family, he could be ready to have the children returned to him within a reasonable time. Mother's general argument on appeal is that DHS failed to prove that her risk of relapse rendered her unfit or presented a serious detriment to the children at the time of trial, and that it is not in the best interests of the children to terminate her parental rights.

DHS counters that it proved unfitness through evidence of parents' personality disorders and drug addiction that have resulted in a consistent and long-standing pattern of drug use, domestic violence, and neglect of the children. Further, DHS asserts that reintegration of the children within a reasonable time is unlikely because, despite the provision of extensive services over a period of several years, mother and father have been unable to sustain sobriety and complete the required treatments and services and have

failed to establish a safe home for the children. We agree with DHS, and affirm the juvenile court's judgments.

## I.  FACTS

We find the following facts on *de novo* review. ORS 19.415(3)(a) (appeals in termination of parental rights cases are reviewed *de novo*). We begin with a chronological review of DHS's involvement with the family and the services provided up to the time of trial. Separately, we examine the facts related to parents' mental health. Finally, we discuss the circumstances of mother, father, K, and I at the time of trial.

### A.  *Mother's Involvement with DHS from 2003 to 2006*

Mother had a child, C, with Bennett in 2002. DHS placed C in substitute care in 2004 because of Bennett's abuse of mother and concerns that Bennett and mother were abusing drugs. Mother quickly engaged in services. Initially, she completed substance abuse treatment and participated in domestic violence counseling, parent training, and individual and group mental health counseling. Nevertheless, she continued to have contact with Bennett and continued to use drugs. In late 2004, mother served time in jail for violating her probation related to earlier convictions for unlawful possession of a controlled substance. DHS filed a petition to terminate her parental rights to C. When she was released from jail, mother completed substance abuse treatment and other services. DHS eventually dismissed the termination petition and returned C to mother's care after mother ended her relationship with Bennett. Mother and C moved to Florida to be closer to mother's sister.

Mother and C returned to Oregon a few months later and it appears that mother remained sober for a period of three years. However, she relapsed when C was about five years old. At that point, mother arranged for Bennett's parents to take custody of C without DHS's involvement. Eventually, Bennett's parents became C's legal guardians, and they later adopted C with mother's consent.

### B.  *DHS Involvement May 2009 to March 2011*

Mother and father began a relationship in 2007. Mother gave birth to I in May 2009, and DHS soon received

a community referral based on mother's substance abuse and her history with C. DHS investigated and determined that there were no safety threats to the child.

In September 2009, DHS received a referral from an anonymous source alleging that mother and father were using drugs and that mother had assaulted father's mother. I was then four months old. DHS investigated and determined that the family's housing situation was unsafe for I because the family was living with a person who had an open DHS case, as well as with people who were known drug users. At that time, father submitted a urinalysis (UA) that tested positive for marijuana, but mother's UA was clean. Initially, parents refused to cooperate with DHS, and, in October 2009, DHS petitioned for juvenile court jurisdiction over I. DHS removed I from the home and placed her in shelter care. Thereafter, DHS referred parents to two housing programs and eventually paid for them to move to appropriate housing. Parents began cooperating with DHS on a voluntary basis and I was returned to their care. At DHS's request, the court dismissed the jurisdictional petition in December 2009.

In March 2010, mother gave birth to K, who tested positive for methamphetamine in the hospital. Although K did not exhibit withdrawal symptoms immediately after birth, her pediatrician observed some symptoms that were consistent with methamphetamine withdrawal a few weeks later. Mother admitted that she had used methamphetamine shortly before K was born. DHS sought, and was granted, temporary custody over I and K. In May 2010, the juvenile court took jurisdiction over the two children, and DHS placed them in nonrelative foster care. DHS and parents entered into action agreements that required parents to complete drug and alcohol treatment, demonstrate a drug-free lifestyle, submit to UAs, participate in individual and family counseling, and comply with a visitation plan.

DHS referred parents to enhanced visitation through Catholic Charities and a baby bonding group. DHS also referred father to a parenting program and mother to Emergence for intensive drug and alcohol outpatient and aftercare. By September 2010, father had made significant

progress after completing the referred services and sub-stance abuse treatment and aftercare. DHS, with court approval, returned the children to father's care, but first required mother to move out of the family home and into a recovery house because of ongoing concerns about her drug use. In November 2010, DHS allowed mother to return to the home, and eventually DHS asked the juvenile court to close the case. In March 2011, the juvenile court dismissed jurisdiction and terminated the wardship over K and I. The children were then one and two years old.

## C. *DHS Involvement July 2012 to April 2014*

DHS received an anonymous referral a year later, on July 31, 2012, and made contact with parents at their home two days later. That contact confirmed that parents were using methamphetamine again, that the household conditions had fallen below minimum community standards, and that parents were being evicted from their home and had no place to live other than their car. DHS took physical custody of the girls on that day, and placed them in shelter care with the foster parents.[1] DHS filed a petition for jurisdiction alleging that parents' "use of alcohol and/or controlled substances" and "living instability, employment instability and chaotic lifestyle" interfered with their ability to safely parent the children. A few weeks later, mother petitioned for and obtained a Family Abuse Prevention Act (FAPA) restraining order that prohibited father from contacting mother. The FAPA order was based on allegations of three instances of physical abuse.[2] Mother later admitted that one of the incidents occurred well before the children were born. As for the other incidents, father had slapped her in the face during an argument in the summer of 2011, which resulted in a black eye. In July 2012, father had shot mother with a BB gun in the neck, although mother and father each later testified at trial that that incident was an accident.

---

[1] The foster parents provided foster care for the girls from August 2, 2012 to September 26, 2013, and then again were providing care from March 12, 2014, through the time of trial.

[2] Mother admitted at the termination trial that two of the incidents happened outside of the 180-day period that is required for a restraining order under FAPA.

DHS held a child safety meeting in August 2012. At that meeting, DHS informed father of the safety threats that he needed to alleviate for the children to return home. The juvenile court took jurisdiction over the children in September 2012. At that time, they were two and three years old. The following month, DHS arrived at action agreements with each parent that listed the services and outcomes they needed to achieve to mitigate the safety threats to the children. Father agreed to submit to alcohol and drug screening and to follow any treatment recommendations that resulted from the screening, to submit to UAs, to complete a batterers' intervention program, and to complete a parent-training program. Mother agreed to the same, except that she was expected to participate in domestic violence counseling instead of batterers' intervention. DHS held a series of family decision meetings in late 2012, but father could not attend those meetings because of mother's FAPA order.

Mother engaged in numerous services offered by DHS, including residential drug and alcohol treatment, the UA hotline, Womenspace (domestic violence support), the Relief Nursery (family support), Willamette Family Treatment (parenting classes and mental health treatment), working with an individual parent trainer, and she moved into an addiction recovery house in February 2013. Mother also had plans to begin family counseling with the children. Mother's service provider reports from those services were excellent, and by most accounts mother was doing very well.[3] In early 2013, with DHS's support, the juvenile court authorized DHS to begin work on a "transition home plan" to return the children to mother's care.

As we explain below, because father was not actively participating in services during late 2012 and the first half of 2013, DHS focused mostly on mother. DHS's plan to transition the children home to mother in early 2013 was slowed because of concerns raised by the foster parents and the children's therapists, but eventually the parties settled on

_____

[3] For example, mother's therapeutic parent trainer, Rich, testified that the first half of 2013 was a "good time" for mother. She explained that she had little need to intervene in mother's parenting, that mother handled stress and pressure appropriately, and that she was supportive of returning the children to mother's care.

July 3, 2013, as the "return home date." In the days leading up to that date, however, mother relapsed on methamphetamine. At a hearing also scheduled for July 3, the juvenile court approved return of the children to mother, but required mother to submit to a UA first. After she did so, mother informed the DHS caseworker that she had relapsed and that the UA would come back "dirty." Mother continued using methamphetamine throughout the month of July, and the children remained in foster care. About a week after the hearing, a police officer discovered mother and father together, and arrested father for violating the FAPA order that was still in place.

After her relapse, mother moved into a recovery house. She began attending group and individual alcohol and drug treatment at Willamette Family Treatment in late July 2013, and attended consistently until September. In October and November 2013, her attendance was sporadic due to scheduling conflicts and transportation issues, and she missed a UA in mid-October. Her counselor at Willamette Family closed her file in December 2013 for nonattendance. However, when she attended she had a positive attitude and engaged in therapy. Her counselor noted in her file that mother still had not addressed the codependence issues that marked her relationship with father.

In addition, sometime in the fall of 2013, mother struck C in the face because C was being rude to her adoptive mother (*i.e.*, her paternal grandmother). The blow bruised C's cheek.

Mother returned to Willamette Family in early February 2014 for an assessment and to re-engage in outpatient treatment. Mother reported to her counselor that she had used marijuana in mid-January 2014 due to depression. Mother's drug and alcohol counselor reported at trial that mother was much more motivated and introspective than she had been. She explained that mother's behavior demonstrated that she was committed to being clean and sober and that she was open to change.

Mother also re-engaged in mental health counseling at the Center for Family Development in February 2014. Her counselor, who had previously counseled mother in late

2009, 2010, and January 2011, testified that, in six sessions before trial, mother was "quite reflective" and regretted how her drug use had harmed the children. Mother demonstrated insight into very difficult situations and took responsibility for her children's situation.

Meanwhile, after signing his action agreement in October 2012, father had been slow to engage in services. Late that year, father, who was using methamphetamine, missed a number of scheduled visits with the children. DHS stopped visits to arrange a "confirmation system" so that the children were not transported to the visit center unless father had confirmed an hour before the visit that he would attend. In January 2013, DHS sent father a letter of expectation clearly outlining DHS's expectation that he engage in alcohol and drug treatment and domestic violence intervention and that he confirm and attend visits with the children. DHS referred father for a psychological evaluation, which he completed in January 2013 with Dr. Sorenson. DHS also referred father for a drug and alcohol assessment, the UA hotline, parenting classes, and batterers' intervention.

Father balked at engaging in the DHS-approved substance abuse treatment programs at Willamette Family Treatment or Emergence because he did not feel that either would be effective for him because of the "religious tones" of the programs. Instead, he elected to participate in a treatment program at Chrysalis. Because that program is not "DHS approved," DHS did not pay for treatment at Chrysalis. Nevertheless, father's caseworker negotiated with Chrysalis to obtain the required releases and to try to secure an indigent waiver for father. Father's caseworker indicated that she "was in support of that, versus nothing."

Almost 10 months after DHS removed the children, father began the group drug and alcohol treatment program at Chrysalis. He engaged in that program from June 2013 through November 2013. His initial UA tested positive for marijuana, but otherwise he provided clean UAs for the rest of his time in treatment. Although his attendance was "at times not very consistent," father was active and engaged in the group sessions when he was there. Father's drug and alcohol counselor at Chrysalis closed father's file in

December 2013 at father's request; father reasoned that he was clean and they should graduate him from treatment. Because he met the requirements for completing treatment, his counselor did so but believed that father "could use some continued contact in the form of groups and one-on-ones" so that he could have a little more time to understand how to use the tools that he had learned in the real world. The counselor's "service conclusion summary" indicated that father had a "very high relapse potential."

As for father's required batterers' intervention and parenting classes, DHS had referred father to Christians as Family Advocates (CAFA) in August 2012, but father waited until February 2013 to attend intake, at which he stated that he did not believe that he needed domestic violence classes, and then did not attend his first sessions for another six months. He attended regularly between August and November, but then stopped attending classes. At that point, he had attended 9 out of the 36 required domestic violence sessions and 2 out of the 15 required parenting classes. Father re-engaged in services in March 2014, for a "reintake" and one domestic violence session and two parenting classes.

In October 2013, the juvenile court changed the permanency plan to adoption, noting that even though parents were clean and engaged in services at that point, "they each have a history of achieving sobriety and stability, only to relapse back into old patterns."[4] The court also determined that the children needed permanency because, given the multiple alternative placements in their short lives,[5] each was demonstrating anxiety and difficulty with any type of transition. After the plan was changed, DHS filed petitions to terminate parents' rights to the children.

After DHS filed the termination petitions, mother and father visited with the children at DHS facilities each

---

[4] The children were taken out of the foster parents' home and placed with their maternal grandmother in September 2013, presumably because DHS viewed grandmother as a potential adoptive resource. However, in March 2014, DHS removed the children from grandmother's home because of her failure to consistently take them to therapy and placed them with the foster parents again.

[5] I, then age four, had experienced three foster placements by October 2013, and K, then age three, had experienced two foster placements.

week and, consistently with prior observations, the visits generally went well for both parents. Father was engaged and interested at the visits and provided appropriate activities and snacks and was receptive to feedback. In general, he attended regularly and the visits involved high-quality, positive interactions between father and the children. As for mother, an incident occurred at a visit in September 2013, at which I complained that mother "bit her bottom," and DHS responded by increasing supervision at mother's visits. Otherwise, mother's visits have gone well. She has been engaged, affectionate, and appropriate with the children, and the visits have demonstrated a bond between mother and the children. Mother also accepts direction from the visit supervisors.

D. *Mother's Mental Health*

Because of mother's lengthy and repeated involvement with DHS, she underwent psychological evaluations in 2004, 2005, 2010, 2013, and 2014. In addition to diagnoses on Axis I of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) related to her drug abuse, mother has consistently been diagnosed on Axis II with Personality Disorder Not Otherwise Specified with antisocial and dependent features. Dr. Basham, who evaluated mother in 2004, 2005, 2010, and 2014, stated in his 2014 evaluation that, throughout his contact with mother, her personality disorder has presented the greatest impediment to her prospects for parenting because she has a longstanding condition that is resistant to change. Basham supported his diagnosis and conclusions with citations to mother's pattern throughout her adult life, where "she has had some period of improved functioning" that has been repeatedly disrupted by relapse. Basham opined that the "stress, demands, and responsibilities of caring for the children on a full-time basis would be a significant stressor to [mother] and leave her at an increased risk of relapse to drugs, resumed bouts of depression, or being involved with an abusive partner."

At trial, he explained that mother's personality disorder presented a significant risk to her ability to parent because the disorder makes it likely that her substance abuse problem would keep returning and disrupting her

life. Basham also testified that, based on mother's mental health therapy records, he did not believe that the type of therapy that mother was participating in at the time of trial was sufficient to treat her personality disorder. In fact, he opined that, given mother's history, the prospects for change through mental health treatment were poor because, first, mother "has a psychological condition that is persistent, highly resistant to change," and "has been in place for at least a decade," and, second, she "has engaged in a significant amount of treatment over that time," yet the "pattern of problems has persisted."

Basham testified that mother's personality disorder has a detrimental effect on the children. He explained that people suffering from her disorder demonstrate irresponsibility and inconsistency when responding to a child's needs. He also believed that the children were at increased risk of witnessing mother's drug use, domestic violence, and her role-modeling of antisocial behavior.

Sorenson, who evaluated mother in 2013, testified consistently with Basham. Sorenson described mother's personality disorder as an "enduring set of beliefs about oneself, about one's world and behavior patterns, that go together in some notable way and are in conflict with what is true about the world as most of the rest of us believe and understand, that present a real and significant problem for them in their functioning." Sorenson expressed optimism that mother was reportedly engaging in mental health therapy "more fully" at the time of trial, but cautioned that what matters is whether she is exhibiting an understanding of how her thinking is leading to the problem behaviors. In his view, however, mother's prognosis for sustaining positive change for any significant time period was poor because of her diagnosis and the pattern reflected in the past 10 years.

E.   *Father's Mental Health*

Like mother, father has consistently received a diagnosis related to his drug use on Axis I of the DSM-IV; on Axis II, father was diagnosed in 2010 by Basham and 2013 by Sorenson with Antisocial Personality Disorder. Sorenson explained that, for purposes of father's parenting abilities,

his personality disorder is the most serious diagnosis. He explained that father's disorder is marked by a persistent belief pattern that remains stable despite efforts to change, or experiences that "argue against" those perceptions. Father's disorder presents a potential risk to the community because father cannot appreciate when his behavior is a problem; instead, despite evidence to the contrary, he perceives others or external factors as the problem. Accordingly, father lacks motivation to change. Sorenson stated that the ability of a parent with an antisocial personality disorder to effectively care for a child is compromised because the parent has a very strong belief in his own abilities, so he may ignore or overlook the child's problems, dismiss the concerns of others, or believe that he can overcome any problems on his own without help. Sorenson expressed particular concern regarding father's overwhelming and unrealistic belief in his own ability to overcome any problems that may arise.

In his evaluation, Sorenson suggested that a style of therapy called "motivational interviewing" might be most effective for father, but concluded that, given father's personality characteristics, he demonstrates "a willingness to return to old behavior patterns, including poor planning, drug use, and a lack of consideration for others when determining his own behavior." Sorenson opined that he did not expect that "forced" services and treatment would alter father's basic belief system or change his behavior much. That is so because father demonstrated through his behavior that "his goal is to assert his beliefs" even when doing so causes him (and the children) significant problems.

F. *Mother's Circumstances at the Time of Trial*

At the time of trial, mother had been living at the Oxford Dalton House since February 2014. Before that she had been living with father at Bennett's mother's house. She was engaged in services with Willamette Family, CAFA, and the Center for Family Development and in drug and alcohol counseling. She admitted that she had smoked marijuana as recently as January 2014 because she was depressed, but had otherwise been sober since her relapse in July 2013. She explained that she and father were a "couple" but that they were not ready to live together or parent together. She

expressed a desire to do whatever was needed for the children to return to her care and explained that her plan for the return of the children would be to stay in current services and to leave Oregon "when allowed to." She acknowledged a desire to get away because of "a lot of damage here" and a "lot of people that she has used with."

## G.  *Father's Circumstances at the Time of Trial*

At the time of trial, father was living in his car and unemployed. A little over a month before the termination trial, father had been involved in an altercation with his mother. Father claimed that he pushed his mother when attempting to ward off her attack; as a result, she fell, hit her head on a piece of furniture, and sustained a laceration. Police arrested father and the state charged him with fourth-degree assault. He pleaded guilty the week before the termination trial, and was sentenced to probation.

## H.  *Circumstances of the Children at the Time of Trial*

Stancil acted as I's therapist from September 2012 to September 2013, and again from February 2014 to the time of trial. Stancil testified that in September 2012, I, then age 3, showed symptoms of indiscriminate attachment associated with attachment disorder. She explained that I wanted immediate physical contact and attention from new people. Stancil also diagnosed I with post-traumatic stress disorder (PTSD) based on her history of numerous foster placements and family experiences. Because of all the disruption in her life, I is not secure in attaching to one person to meet her needs. At first, I demonstrated several developmental delays in speech and in gross and fine motor coordination. She made significant improvement in her first year of therapy, although Stancil testified that I had "regressed recently." Stancil opined that, although she did not formally diagnose I, she believes that the child suffers from reactive attachment disorder, which includes indiscriminate attachment and has features of PTSD. Stancil testified that I needs permanency "now" and, without it, she is at "risk of continued delay and regression in her emotional development."

Reilly treated K from February 2013 to the summer of 2013, and then saw her three times in the four weeks

leading up to the trial. Reilly diagnosed K with adjustment disorder with mixed disturbances of emotions and conduct. She explained that K exhibited difficulty adjusting to different caregiving patterns and homes and to loss of relationships. Reilly used play therapy to assist K with her problems in controlling her impulses and maintaining focused attention. Reilly testified that K's emotional development is delayed and that she needs permanency as soon as possible because the lack of a permanent caregiver has a significant effect on brain development in children her age. She explained that constant stress can permanently harm a child's view of life and relationships.

A therapist who evaluated I and K immediately before trial testified that she was concerned that the girls were going to suffer long-term problems. She explained that children who experience a lack of permanency between birth and age three have interrupted brain structure development that makes it hard for them to form adaptive skills. She also stated that the children showed evidence of chronic stress, and explained that she did not find it surprising that the children showed attachment to father and mother at visits because they were suffering from indiscriminate attachment disorder.

## II.  ANALYSIS

The juvenile court terminated parents' rights due to unfitness, ORS 419B.504, which is permissible if the court finds by clear and convincing evidence that the parent is "unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." *Id.* Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007). A parent's fitness is measured at the time of the termination trial, *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006), and the focus of the test is "on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or

condition in the abstract." *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). In addition, termination of parental rights must be in the child's best interests. ORS 419B.500.

To determine if a parent is unfit, courts engage in a two-step analysis. *Stillman* Or at 145. First, the court determines whether "(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child." *Id.* "Second— and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.'" *Id.* In evaluating the second step, the court must "evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.'" *Id.* at 145-46. The "reasonable time" standard is child-specific—the period of time that "is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).

A.  *Father*

Father contends that DHS failed to prove that he was unfit at the time of trial or, alternatively, that he could not become fit within a short time period. In support, he points to treatment that he has completed and to evidence that "when he is not using drugs" he "has been a consistently appropriate parent." Father argues that he completed treatment at Chrysalis and that there was no evidence that it was "other than an excellent treatment program." He posits that the method of treatment at Chrysalis was consistent with Sorenson's recommendation that father would do best with a program that uses "motivational interviewing." Father further contends that the evidence shows that his treatment was effective and has enabled changes in his life to such a degree that his drug dependence has been properly addressed and, if the children were returned to him, he would not resume using drugs. In particular, he explains that he was in treatment for six months and, with one exception early on, his UAs were negative; his counselor spoke well

of his participation in the program; and he had remained clean and sober for nearly a year before trial. Given that evidence, father contends that DHS failed to prove that father was likely to relapse.

Father also argues that, to the extent that his personality disorder, homelessness, and domestic violence constitute problems, there is reason to believe that those problems are being adequately dealt with. Father asserts that he is fully engaged in a domestic violence program that has a high rate of success, he is engaged in parenting classes, and, "due to recent changes in his health insurance," he has signed up for counseling that uses "motivational therapy mode." In sum, father contends that he has "taken care of his biggest problem (drug use)" and that his remaining concerns are "completely manageable, and they are well on their way to being managed."

Although we agree that father has demonstrated that he can at times be an appropriate and loving parent, based on the evidence adduced at trial, we conclude that DHS proved by clear and convincing evidence that, at the time of trial, father's past drug abuse, domestic violence, personality disorder, and general instability continued to present conduct or a condition that is seriously detrimental to the children. We consider all proven conduct or conditions in combination when evaluating a parent's unfitness. *State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 456, 180 P3d 69, *rev den*, 344 Or 670 (2008). DHS also proved by clear and convincing evidence that father's conduct or condition was not likely to change to allow the children to be integrated into his home in a reasonable time.

We address the most recent past first. Although father graduated from Chrysalis treatment in December 2013, his counselor indicated that he could use additional group support to learn how to use the coping skills he had gained in the real world. His counselor also believed that father had a high risk of relapse. Nevertheless, father concluded that his treatment was sufficient as of November 2013 and asked his counselor to close his file. That behavior is consistent with Sorenson's explanation of the characteristics of father's personality disorder: He has an unrealistic

view of his own abilities to overcome problems despite past experiences that indicate otherwise.

Moreover, father's inconsistent participation in domestic violence and parenting classes also demonstrates father's lack of motivation or ability to change. Although it is true that his service providers indicated that he was engaged and making progress *when he was attending the programs*, father did not engage in those programs until a year after he was referred; he attended for a four-month period before stopping, and, when he stopped, he had completed only a fraction of the requirements for completing the programs. Father returned to those programs a little over a month before the termination trial, but even then attended only one domestic violence session and two parenting classes. Further, contrary to father's assertion that his "remaining problems" are well on their way to being managed, father was arrested for fourth-degree assault constituting domestic violence in March 2014 and pleaded guilty to that crime shortly before trial. Again, father's inconsistent engagement in services is in line with Sorenson's observation that father is motivated to engage in services because of external requirements, not because he believes that he needs to change.

There is ample evidence that father's conduct or condition is seriously detrimental to the children, who have spent the majority of their lives being shuttled between placements and who have demonstrably suffered and continue to suffer from the lack of permanency. Given the evidence, father's conduct or condition, particularly when considered in light of Sorenson's testimony, is unlikely to change in a time that would allow integration of the children into father's home within a time that is reasonable for I and K.

In sum, the record supports the conclusion that father has not sufficiently addressed the conduct or conditions that are seriously detrimental to the children, and may not be capable of doing so. He had almost four years to address the problems that brought DHS into his life but he still does not appear to recognize that his problems are a significant barrier to his ability to parent. Given the uncertainty that father can effect a lasting change, and given that

father has only sporadically engaged in services up to the time of trial, we conclude that it is unreasonable to require the children to wait longer.

B. *Mother*

Mother contends that DHS failed to prove any detriment to the children at the time of trial. She argues that she had then been clean and sober for four months and had not used methamphetamine for 10 months. Further, she points out that her therapist and drug treatment counselor thought that she was approaching her treatment with more motivation and insight than before. In support, mother relies on three cases in which we concluded that a "risk of relapse" failed to qualify as unfitness under ORS 419B.504. *See State ex rel Dept. of Human Services v. D. F. W.*, 225 Or App 220, 201 P3d 226 (2009) (the parents' sustained work to resolve their problems led to conditions at the time of trial that did not justify termination of either parent's parental rights); *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 157 P3d 283 (2007) (it was improper to terminate parental rights where the only evidence regarding the father's condition at the time of trial showed that the father had been making improvements during his incarceration); and *State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 154 P3d 148 (2007) (despite evidence of a "very troubling" risk of relapse, evidence did not support conclusion that the mother had used drugs in the fifteen months before trial).

We conclude that this case is unlike any of the three cited by mother. Those cases may stand for the general proposition that prior substance abuse does not prove *present* unfitness, particularly where there has been a sustained period of abstinence from use and engagement in services. Nevertheless, the evidence in this case consists of much more than prior substance abuse. First, mother has a years-long pattern of drug abuse, sobriety, and relapse. That is so despite engaging in and completing an array of services intended to support her sobriety. Second, the psychological testimony presented by DHS demonstrated that, given mother's personality disorder, her demonstrated pattern is likely to repeat itself, especially because the mental health

therapy that she was participating in at the time of trial was unlikely to effectively treat her disorder. Finally, despite the consequences, mother had resorted to using marijuana in response to depression just four months before the termination trial; thus, there is direct recent evidence of the pattern that mother has demonstrated for at least 10 years before trial. For all of those reasons, we have no difficulty concluding that mother's conduct or condition is seriously detrimental to the children. We also conclude that, given the history of this case, mother's prognosis, and the children's circumstances, her conduct or condition is unlikely to change to allow the children to be integrated into her home within a reasonable time.

## C.  *Best Interests*

Finally, we conclude that it is in the best interests of the children that we terminate the parental rights of mother and father. Both children have spent the majority of their lives in a series of foster placements and are exhibiting developmental delays and attachment issues. Continued delays in permanency will only further compromise their best interests, particularly under circumstances where both parents have an extended history of recovery and relapse that is likely to repeat itself.

Affirmed.