154 April 29, 2026 No. 349

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. L. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. C. E.,
aka A. E., aka A. C. E.,
*Appellant.*

Lane County Circuit Court
24JU04105; A188453 (Control)

In the Matter of B. R. R. E.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. C. E.,
aka A. E., aka A. C. E.,
*Appellant.*

Lane County Circuit Court
24JU04107; A188454

In the Matter of L. R. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. C. E.,
aka A. E., aka A. C. E.,
*Appellant.*

Lane County Circuit Court
24JU04108; A188455

Karrie K. McIntyre, Judge.

Submitted February 18, 2026.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Paul L. Smith, Interim Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

In this consolidated juvenile matter, mother appeals from three judgments terminating her parental rights to her children, A, B, and L, who were 8, 7, and 5 years old respectively at the time of the termination of parental rights trial in April 2025.[1] She raises six assignments of error—two for each child—contending that the juvenile court erred in its determination that terminating her parental rights was in the children's best interests and in ultimately terminating her parental rights. We affirm.

"We review the record in proceedings for termination of parental rights *de novo*, ORS 19.415(3)(a), and determine anew whether to terminate parental rights." *Dept. of Human Services v. J. M.-A.*, 333 Or App 334, 336, 554 P3d 263 (2024). "That standard requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [the children's] best interest" and our role in resolving the best interests question is "for the most part, identical to that of the juvenile court."[2] *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019) (footnote omitted). We generally defer to the juvenile court's credibility findings that are based on the court's observation of the witnesses. *Id.* at 750 n 1.

A juvenile court may terminate a parent's parental rights based on unfitness, ORS 419B.504, if it determines "by clear and convincing evidence that the parent is unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to

---

[1] The three children have different biological fathers. L's father is deceased; the other two fathers are not parties to this appeal.

[2] We note that in the juvenile court's written opinion entered on July 7, 2025, it questions whether a parent might be able to vacate a permanent guardianship over a child by seeking to terminate the child's wardship. We explained in *Dept. of Human Services v. M. H.*, 306 Or App 150, 164, 473 P3d 1152 (2020), that "a permanent guardianship is not a temporary arrangement and, further, a parent cannot seek to vacate it." It is not clear to us to what degree that misstatement of the law influenced the juvenile court's ultimate decision; given our standard of review—we try the case anew on the record—we need not further address the misstatement.

change." *Dept. of Human Services v. C. M. K.*, 270 Or App 1, 16, 346 P3d 1254, *rev den*, 357 Or 324 (2015) (internal quotation marks omitted); ORS 419B.521(1) ("The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *."). Mother does not contend that the court erred in its determination that she was unfit under ORS 419B.504, and therefore we need not reach that issue.

When the juvenile court concludes that the parent is unfit under ORS 419B.504, it may only terminate the parent's parental rights if it further concludes that clear and convincing evidence also establishes that termination is in the particular child's best interests. ORS 419B.500; *Dept. of Human Services v. D. E. P.*, 315 Or App 566, 570, 502 P3d 764 (2021). Considerations that inform the best interests inquiry include "(1) the strength of the bond between the parent and child; (2) whether severing that bond will help or harm the child; (3) the benefits to the child of terminating parental rights; and (4) the risk of harm to the child posed by termination." *Dept. of Human Services v. L. M. B.*, 321 Or App 50, 53, 515 P3d 927 (2022).

On appeal, mother argues that as to A and L, terminating mother's parental rights would jeopardize their current placement with a close relative, while denying the Oregon Department of Human Services's (ODHS's) termination petitions would protect it. As to B, who was living in a residential treatment facility at the time of trial, mother argues that uncertainty about the availability of a long-term placement means that terminating mother's rights risks leaving B a legal orphan, and threatens B's best interests. In response, ODHS maintains that it is in the best interests of A and L to terminate mother's parental rights, and it argues that terminating mother's parental rights as to B is in her best interests because it would free her to be adopted by a qualified resource.

Having reviewed the record *de novo*, we conclude that terminating mother's parental rights was in the children's best interests.

Regarding B, the evidence at trial was that she did not have a bond with mother, and in fact, B is fearful of

mother and any connection or contact with mother presents a frightening experience for her. Dr. Sorensen, the psychologist who provided an evaluation for each of the children, explained that B has high needs to manage the distress and trauma that B has experienced and that she needs permanency and a sense of safety sooner rather than later with a caregiver who is able to address her needs. In Sorensen's opinion, adoption was in B's best interests. Myers-Munger, the ODHS adoption caseworker, testified that although they do not have approved adoption home studies for any of the children yet, she believes that the agency has potential adoptive resources for each of the children. There was no testimony to support mother's assertion that B would remain a legal orphan if mother's parental rights were terminated.

Regarding A, Sorensen testified that her bond with mother is an anxious attachment. There is a connection there, but it is not a strong positive one in the sense that there is not a belief in stability, safety, and full comfort; it is a worried, distressed connection. A has been diagnosed with post-traumatic stress disorder and attention deficit hyperactivity disorder combined type, and she has a tremendous amount of anxiety as she wonders about her future. Sorensen explained that A needs a safe and stable placement with very low chance of disruption. She needs a caregiver who is able to monitor and respond quickly to her needs and who can work well with providers to address A's needs and make sure that she gets whatever help she needs. The focus should be on making things better for A so that she can feel that there is a sense of safety and that people have her back. She needs a caregiver who is going to be there for her forever, without fear of disruption in the future. In Sorensen's view, A has a higher need for permanency than the average child, and she needs that permanency now.

L is the youngest of the three children. The testimony was that she has little to no memory of any events that had taken place prior to her placement. Sorensen testified that she was the one child who was indicating that she wanted to spend more time with mother and go back to being with mother; she had a strong positive attachment to mother. He explained that it is not uncommon for younger

children who have less exposure to the history and are less concerned about the potential difficulties to maintain a higher degree of attachment to their prior caregivers. L has a very strong bond with her sister, A, and, in Sorensen's view, having the two of them placed together in a long-term placement would be the healthiest option for L.[3] Sorensen strongly recommended that L's sibling connection be preserved, and he stated in a recommendation letter that was received as an exhibit that "[a]doption would be considered best as a means of prioritizing those ties with her siblings over some chance of reunification with her mother."

Sorensen expressed a preference for adoption over guardianship; he views adoption as allowing the children to become equal partners in their families.

Myers-Munger also testified that she believes adoption is the best option for these children because it appears that their ongoing connection with mother is more harmful to them than beneficial. In her view, considering the distress that mother's inconsistency in visits and lack of prioritizing the children has caused, adoption would provide the separation from their mother that she thinks is needed for them to heal and focus on healing rather than whether mother is going to show up for them. Myers-Munger explained that mother's engagement in substance abuse treatment while this case has been open has been minimal at best, and she has no reason to believe that that is going to change anytime soon. In Myers-Munger's view, it might take years for mother to make the changes needed to safely parent her children, and the children cannot wait years.

In sum, considering the record before us, including the evidence summarized above, we conclude that it is in the best interests of all three children for mother's parental rights to be terminated.

Affirmed.

---

[3] At the time of trial, L and A were placed together with L's paternal grandmother.